

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0298-09

### SHERRY LYNN SMITH, Appellant

### v.

### THE STATE OF TEXAS

## ON STATE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE THIRTEENTH COURT OF APPEALS
## GRIMES COUNTY

KEASLER, J., delivered the opinion of the Court in which KELLER, P.J., MEYERS, PRICE, WOMACK, HERVEY, and COCHRAN, JJ., joined. JOHNSON, J., concurred.

## O P I N I O N

Contrary to the court of appeals, we hold that the trial judge did not err in denying Sherry Lynn Smith's request to instruct the jury that her ex-husband, Daniel Gardner, was an accomplice as a matter of law because the evidence did not conclusively establish that the capital murder charge against Gardner was dismissed in exchange for his testimony at Sherry's trial. We further hold that the court of appeals erred in holding that the non-

accomplice evidence was insufficient to tend to connect Sherry to the murders.[1] We therefore remand this case for proceedings consistent with this opinion.

## Background

Sherry was convicted of capital murder and sentenced to life in prison for shooting her husband, Carey Smith, and her father-in-law, Charles Smith, in December 2002 while they slept.

### The Smiths

Sherry worked for the Texas Department of Criminal Justice (TDCJ) for most of her career. She started in the mail room at the Wallace Pack Unit and later became a prison guard. Sherry was involved in a romantic relationship and lived with a fellow prison guard, Edward Rollins, from 1991 to 1999. Sherry qualified to use a gun per TDCJ policy and, during her relationship with Rollins, she and Rollins would shoot high-powered rifles in the back yard. In January 1999, after Rollins moved out of the house that the two had rented together, Sherry moved into TDCJ employee housing, where her rent was deducted from her paycheck.

In addition to her job as a prison guard, Sherry began to clean Carey's house. Carey was a supervising prison guard at the Wallace Pack Unit. Carey had never been married and shared a house with his ailing father, Charles Smith, in Grimes County. Charles, who was recently widowed, suffered from congestive heart failure, diabetes, emphysema, and asthma.

---

[1] *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005).

Carey and Charles ran a hay-hauling business on the acreage surrounding their house.

Sherry had a car but was not making the monthly payments, even though Carey was giving her money for that purpose. Sherry spent the money on other things, and she turned in the car because it was going to be repossessed.

Shortly after Sherry started cleaning the Smith's house, she moved in to take care of the house and help Carey care for Charles. Sherry made sure that Charles took his medications, was bathed, clothed, and fed, and that he used the restroom so that he did not soil himself. She also helped care for Carey, who had sleep apnea. Sherry then quit her job at TDCJ and cashed out her entire retirement account, which was worth about $17,000. Carey retired around the same time. The two married within a year, on July 26, 2000, which surprised their friends because the two had never been on a traditional date. Sherry stated that Carey did not "date," unless fishing a few times qualified as dating.

By all accounts, the marriage was one of convenience, though Carey had shown a romantic interest in Sherry in the beginning. To friends, family, and acquaintances, Sherry was forthright in describing her marriage to Carey as one involving a *quid pro quo*—Carey needed someone to take care of his home and father, and Sherry liked to feel needed and desired financial stability.

The couple's friends and house guests noted that Sherry took good care of the house; she enjoyed cooking and cleaning. She redecorated the house. According to Carey's respiratory therapist, Debra Cargill, Sherry was an upbeat person and seemed to provide for

Carey's and Charles's needs. Charles's home health-care nurse, Jerry Simcik, held a different opinion. When Simcik visited Charles, she felt tension and stress in the household. Simcik noticed that Sherry did not consistently administer a particular drug to Charles that was prescribed to extract excess fluid from Charles's body as a result of his diabetes. Simcik noted that Sherry failed to administer the drug on a few occasions, and the excess fluid stressed Charley's entire system—his kidneys, heart, and lungs. Sherry would get irritated with Charles and, in Simcik's opinion, Sherry did not care for Charles out of love; it was just something that she did. She stated that Sherry inquired a few times about putting Charles in a nursing home. Simcik indicated that she decided not to discharge Charles as a patient because he lacked adequate care. She wanted to keep an eye on him.

Sherry told Linda Valadez and Nikki Johnson, her friends and former co-workers, that she married Carey so that she could retain heath-care insurance upon quitting her job. She also explained that she had sex with Carey only one time; she was not attracted to him because he was severely overweight. The two slept in separate rooms. Sherry told Johnson that the marriage would make her life easier because she would not have to worry about paying for rent and food. Sherry told Valadez that she was going to "use" Carey. Sherry told Valadez that when Carey and Charles died, she would have all of the property, including the house, as well as Carey's retirement check; she would be "set up." Sherry made a similar statement to Cargill, stating that it would all be hers someday, when Cargill complimented Sherry on the home's decor.

Because Sherry no longer had a car, Carey bought Sherry a truck in Charles's name, claiming a tax deduction on account of the hay-hauling business. Sherry told Valadez that Charles had two CDs and that the interest on the CDs paid for the truck. Sherry also told Valadez that Charles gave her two $500 checks after she gave Charles cough syrup and asked him to sign the checks. Sherry told Valadez that she did not like to go to Carey and Charles for money; she had to ask them for every nickle and dime. However, Sherry's friend Kim Paskett got the impression that Sherry's spending was not restricted. When Paskett ran into Sherry at the grocery store, Sherry told her that she had Carey's checkbook and was in good shape financially.

Sherry told Johnson that she maintained control over the mail that was delivered to the house. Sherry did not allow Carey or Charles to get the mail, but she would put the mail on the table where they could see it. Sherry told Johnson that Carey would receive credit card offers in the mail and that she was going to request a card in his name and have it sent to Johnson's post office box. Sherry explained that she did not have any money—the money from her retirement account was gone—and that she was "doing it for security reasons" in case something happened to Carey. Johnson then began to receive statements from two credit cards in Carey's name at her post office box. Sherry told Johnson that she owed $30,000 on one account and that she was having a difficult time making the minimum payments on the accounts.

Shortly after Sherry and Carey married, Carey executed a new will leaving everything

to Sherry and making her the executor of his estate. Charles owned the property and house and his will bequeathed both to Carey and left Carey almost half of the remainder of his estate. According to Carey's attorney, a layperson looking at the two wills would conclude that the house and property would go to Sherry if both men died at the same time.

In the fall of 2001, Sherry's daughter Tori and her two-year-old granddaughter, Logan, moved onto the Smith's property. Sherry had been estranged from Tori. Tori's father Daniel Gardner, Sherry's ex-husband whom she divorced in the late 1970's, had raised Tori. Gardner gave Tori his old travel trailer and set it up next to the Smith house. When Tori moved onto the property, she noted that it was understood by Carey and Sherry that their marriage was one of convenience. She believed that Sherry was content with the marriage. Sherry was happy to have Tori back in her life, and her life revolved around Logan. Carey and Charles welcomed Tori and Logan into their lives, and Tori grew fond of both men. Tori knew that Sherry would do anything for her and Logan. Sherry cared for Logan while Tori worked and when Tori went out with her friends. Sherry also cooked for everyone, and Tori and Logan would eat with everyone inside the house. At this time, Charles's health declined, and he required more assistance from Sherry. Charles was virtually homebound, constantly needed oxygen, took a lot of medication, and required hospitalization every two to three months. Sherry would stay with Charles when he was hospitalized. Tori and Sherry's friends noticed that Charles's declining health caused Sherry stress; she was tired.

In January 2002, Tori moved into a mobile home approximately five miles from the

Smith property. Sherry would visit Tori a few times a week, and she still watched Logan for Tori when Tori worked. Toward the end of the summer in 2002, Gardner started to live with Tori a few weeks each month, and he had his own room in the house. Gardner was having problems with his current wife, who lived in Junction, and he wanted to find a job in Grimes County. At first, Sherry stayed away from Tori's, but then she started to come over more often to visit Tori and Logan. Tori noticed that Sherry wanted to be around Gardner and sought his attention. Sherry told Tori that she had kissed Gardner and that she still loved him. Tori did not talk to her father about Sherry, but she believed that Gardner was not interested in Sherry because he never acted affectionately towards her. Johnson also noticed that Sherry was romantically interested in Gardner. Sherry told Johnson that Gardner was a "changed person" and indicated that she may get back together with him.

Sherry began to become increasingly frustrated with Carey and Charles because they would call her at Tori's to "keep tabs" on her and ask when she was coming home. Sherry would get angry and tell Carey that she "would be home when she got there." About a month before the murders, Carey came to Tori's house to get Sherry after she ignored his repeated requests over the phone for her to come home. Sherry was "ugly" to Carey. Sherry also told Tori that Carey's health was not good because of his weight and that Charles was not going to live much longer. Sherry told Tori that Carey would not live long after Charles died and that everything would be hers. According to Tori, Sherry was no longer content; she was unhappy and tired. When Tori and Sherry discussed Sherry ending her marriage to Carey,

Sherry told Tori that she did not "know where she would go or what she would do."

Sherry helped Tori out financially. She bought things for Tori and Logan, gave Tori money, and paid Tori's $400-a-month rent. Sherry told Tori that she had a credit card in Carey's name that Carey did not know about. Tori received a credit card bill in Sherry's name at her house each month.

In November 2002, Sherry was "burning the candle at both ends," according to Joretta Mitchell, Sherry's cousin. Sherry helped Mitchell take care of Mitchell's dying mother (Sherry's aunt) while she also took care of the house, Carey's and Charles's health, and babysat for Logan.

**The Murders**

On Friday, December 6, 2002, Tori was scheduled to work at the Diamond Shamrock from 4:00 p.m. to 12:00 a.m. Tori used Gardner's old diesel truck to get to work because her car had been totaled in an accident. She dropped Logan off with Sherry on the way. Around 9:00 p.m., William Kowis, Carey's friend, called Carey and talked to him on the phone about his day and the weather. Tori called Sherry at 10:00 p.m., and Sherry told Tori that she and Logan had been sleeping. Sherry called Tori after the store closed at midnight, and Tori told her that she would be later than ususal to pick up Logan because she still had to stock the cooler. Sherry was angry at Tori because she was planning on going to Huntsville early the next morning before going to visit a cousin who was in the hospital in Humble. Sherry "cussed out" Tori and hung up on her. Tori left work at 12:45 a.m. on December 7th and

went to pick up Logan. She arrived shortly before 1:00 a.m., picked up Logan, and headed home. Sherry went to back to sleep after Tori left. When Tori got home, she parked Gardner's truck as close to the house as she could because she had to carry Logan inside. Gardner was there when Tori got home. Tori went to bed around 2:30 or 3:00 a.m., and Gardner went to bed around the same time. Tori's landlord, who lived on the property, did not see Gardner's truck in the driveway in front of Tori's house when she drove by sometime between 7:00 and 7:20 a.m. on December 7th. Tori did not hear anything near the house, including a diesel truck, which she would have heard, from 3:00 a.m. until she got up the next morning around 10:00 a.m.

Sherry got up around 3:30 a.m. on December 7th and left her house around 4:00 a.m. and headed to the Wal-Mart in Huntsville, which was about thirty miles away from her house. According to Sherry, Carey and Charles were asleep when she left. She heard Carey snoring. Sherry arrived at the Wal-Mart at 5:15 a.m. After buying some pajamas for her ill cousin, Sherry left Wal Mart at 6:42 a.m. and drove to see her cousin Mitchell at Mitchell's son's apartment near Houston. Mitchell knew that Sherry would arrive there early but was unsure of the exact time because Sherry was not sure how long she would be at Wal-Mart. Sherry arrived at the apartment between 7:30 and 8:00 a.m. Around this time, between 7:30 or 7:45 to 8:00 a.m., one of the Smith's neighbors was leaving his home and noticed that there were only two trucks at the Smith house, both of which belonged to the Smiths. The neighbor also did not hear any gun shots coming from the Smith house, which he would have

been able to hear.

An hour and a half or so after Sherry got to Mitchell's son's apartment, Sherry and Mitchell drove to Humble in separate vehicles to visit Sherry's cousin in the hospital. Sherry left the hospital around 1:00 p.m., drove to a Cingular store in Huntsville, and purchased a new cell phone. Sherry called Tori when she was about a half hour from home, and the two arranged to meet at the Diamond Shamrock so that Sherry could pick up Logan and watch her while Tori worked. Sherry got to the Diamond Shamrock at 3:20. Gardner drove Tori and Logan to the Diamond Shamrock, and they arrived at about 3:40. Sherry talked to Gardner while Tori took Logan into the store to get a drink. Sherry then left the Diamond Shamrock and headed to Tori's house to pick up Logan's ear drops, which were the same ones Sherry used. Gardner was pulling in when Sherry was leaving.

When Sherry returned home, she entered the house through the garage door and walked into the living room. The garage light that she turned on when she left in the morning was still on. She noted that it was quiet in the house, but did not think that was unusual. She put Logan on the floor and gave her a puzzle to play with. She proceeded down the hall toward the bedrooms. She noticed Carey lying in his bed. This was abnormal because Carey did not lie in his bed during the afternoon. Because Sherry could not see Carey's face, she turned on the light. She saw blood on his face, turned off the light, and closed the door. She then went to Charles's room, looked at his face and saw blood, and shut the door. She knew that both men were dead from the blood and the way that they looked. She called 911 at 4:30

p.m.

While crying, Sherry frantically reported to the 911 operator that she just got home and that her husband and father-in-law were dead. She expressed concern over getting Logan out of the house, and directed Logan to put her coat on shortly thereafter. Sherry had difficulty giving the 911 operator directions to the house. Sherry stated that she did not "need this" and could not "believe this was happening" to her. When Logan reacted to Sherry's demeanor and became upset, Sherry eventually directed Logan's attention to the puzzle. Sherry expressed concern that someone was in the house so she went outside on the porch with Logan. After Sherry got off the phone with the 911 operator, she called Gardner to come and pick up Logan.

**The Investigation**

The 911 operator dispatched the Grimes County Sheriff's Office to the Smith house, reporting the discovery of two bodies in the residence. Ryan Rutledge, a patrol deputy, arrived at the house first, and Gardner pulled into the driveway at the same time. Several other officers, who had been dispatched to the scene, arrived in short succession. Deputy Rutledge saw Sherry standing in the front yard. The officers identified Sherry and Gardner. Lieutenant Todd Greene headed the crime-scene investigation. Gardner told Lieutenant Greene that he was there to pick up Logan.

Lieutenant Greene began his investigation. Before Lieutenant Greene entered the house, another officer informed him that only EMS and Deputy Ron Schultze had been inside the house and that EMS had to open the doors to Carey's and Charles's bedrooms.

Lieutenant Greene entered the house and surveyed the crime scene. He observed Carey's and Charles's bodies in their beds. He ordered Deputies Rutledge and Schultze to cordon off the scene and asked Investigator Angela Schroeder to conduct gun-shot residue testing on Sherry's and Gardner's hands.

Looking at Carey's body, Lieutenant Greene observed a bullet entry wound behind his right ear and an exit wound on the back of the left side of his head, with a small amount of blood from the wounds. There was also some blood coming from his nose. Lieutenant Greene also observed gunshot residue on the pillow, which was ripped. After Carey's body was removed, Lieutenant Greene recovered a bullet fragment from the inside of Carey's mattress. Lieutenant Greene did not notice any weapons or shell casings around the house. He also noted that there were no signs of a forced entry or a struggle and that the gun rack in the house was empty.

Curtis Klingle, an investigator with TDCJ's Special Prosecution Unit, accompanied Lieutenant Greene in processing the crime scene. He identified Carey's and Charles's wounds as gunshot wounds. The medical examiner later identified the wounds as rifle wounds and estimated that both men were shot about eight to twelve hours, and possibly up to twenty hours, before Sherry called 911. When inspecting Charles's body, Investigator Klingle noted a bullet entry wound at the base of his throat near the pectoral muscle that was about the size of a nickle. Investigator Klingle described it as a "channel cut into the flesh or seared into the flesh." He did not observe any powder burns around the wound. Investigator Klingle did not discover any firearms in either of the bedrooms.

While conducting a search of the house, Investigator Klingle noted that the gun rack was empty. Investigator Klingle did not recover any gun shell casings from the house. He did, however, seize several boxes of rifle and shotgun rounds from a hutch in the utility room. Two of the boxes seized contained 25.06 caliber rifle rounds, which Investigator Klingle described as small high-velocity rounds. In Investigator Klingle's opinion, the 25.06 ammunition indicated that, at some point, the Smiths kept a gun in the house that used that particular caliber round.

Sergeant Johnny Martinez also investigated the scene. He also took note of the empty gun rack. He observed that the house was in order, which, given the double-homicide, seemed out of the ordinary. He also noted a child's puzzle on the living room floor with plastic wrap nearby.

Investigator Schroeder conducted gun-shot residue testing on Sherry and Gardner by swabbing their hands. Investigator Schroeder bagged the swabs and turned them over to the lab for testing.

Lieutenant Greene instructed Investigator Schroeder to interview Sherry. Investigator Schroeder interviewed Sherry in her patrol car from 6:15 to 6:35 p.m. and tape recorded the interview. Sherry related the time-line of events, beginning with Tori's late-night pick-up of Logan. Seemingly referring to a prior conversation, Investigator Schroeder asked Sherry where the guns in the house "are" located. Sherry stated that "they're on the gun rack" by the back door. When Investigator Schroeder asked how many guns "are" in the rack, Sherry stated that "it is" full.

Sherry also agreed to be interviewed by Ranger Bryant Wells and Sergeant Johnny Martinez at the Grimes County Sheriff's Office that night. According to Ranger Wells, Sherry did not cry during the interview and her demeanor changed at times: "she on occasion laughed. She on occasion was quite serious." He also stated that Sherry's speech was slurred at first but that the slur immediately went away and that she was cooperative. Ranger Wells and Investigator Martinez asked Sherry if she noticed anything missing from the house and "what type of guns did [she] have in the house." Sherry gave them a description of some of the guns and a gun case that belonged to Carey's nephew. She stated that there "were" two .22's, one of which she had used in the past. She stated that there were three guns with scopes on the rack and a .22, on the bottom of the rack, without a scope. Sergeant Martinez told Sherry that the black gun case she described was gone, and in response, Sherry stated that it was there and then asked, "All the guns are gone, aren't they?" Sherry stated that "every one of them was there."

When Sergeant Martinez asked Sherry if she checked on Carey and Charles after observing the blood, she said no; "it was not normal," and she wanted to get Logan out of there. Sherry was candid in explaining her marriage to Carey. In the beginning, Carey asked her to have sex with him and she complied. They had sex maybe three times; Carey would thank her afterward. After he was diagnosed with asthma, she did not want to have sex with him anymore. She stated that they slept in separate bedrooms and that Carey did not "nag" her about having sex. She told Carey that she would never be "in love" with him but that she

would love him. Everything else was fine, and Carey was "good" to her.

Several times throughout the interview, Sherry made disparaging remarks about Carey's weight, referring to his big face when describing seeing blood on it and stating that she did not want that "fat thing" on her when explaining her marriage's lack of physical intimacy. She stated that Carey paid all of the bills and gave her access to his two checking accounts. She would use the accounts to buy cigarettes and gas, and Carey or Charles would give her money to buy groceries.

Sherry gave the clothing that she was wearing to Sergeant Martinez and Ranger Wells after she was interviewed. When Sergeant Martinez and Ranger Wells made the request, Sherry complained about losing her favorite jeans and her only black sweater.

During the course of the investigation, Ranger Wells verified the information Sherry gave to him about her whereabouts on December 7th by obtaining videotapes from Wal-Mart and Diamond Shamrock, a receipt from the Cingular Store, and interviewing Mitchell and Tori. Ranger Wells also obtained Carey's credit-card records, including some statements that had been delivered to Johnson's post-office box. In Ranger Wells's opinion, the credit-card balances on the statements delivered to Johnson's address were "significant." Once investigators gathered all of Carey's credit-card information, documentation showed that Sherry's combined credit debt just before January 2003 was about $50,000.

On December 9, 2002, Gardner called his friend Tracy Beatty and told him to come over to Tori's. When Beatty arrived, Gardner gave him a .22 rifle. About a month later, Beatty threw the rifle in the river. He had heard about the murders and figured that Gardner

was trying to set him up by giving him the murder weapon.

On December 11, 2002, Ranger Wells called Sherry and asked her to come in for a second interview. Sherry agreed, even though she had planned to hold a viewing for Carey and Charles that day at the funeral home. Sherry again related her whereabouts and activities on December 6th and 7th to Ranger Wells and Sergeant Martinez. During this interview, Ranger Wells and Sergeant Martinez inquired into whether Carey was mad at Sherry on Friday the 6th and whether Carey knew about her plans to visit her cousin the next day. Sherry explained that Carey was not mad or upset about anything. She stated that she had recently been away at her aunt's, Mitchell's mother's house, before her aunt died and that Carey understood. However, Carey preferred Sherry to stay at home and did not like it when she stayed with Charles overnight in the hospital.

Ranger Wells and Sergeant Martinez asked Sherry if she had heard that Carey told a friend of his that he was planning on divorcing her. Sherry maintained that she had not; she did not believe it because Carey loved her. When asked about how much she had to lose if Carey divorced her, Sherry stated that she could go back to work at TDCJ and live with her mother or Tori. Sherry acknowledged again that her marriage was unusual; she spent a lot of time by herself or with Logan in her bedroom watching television while Carey and Charles watched television together in the living room. She loved Carey and Charles and had told Carey that she would take care of Charles if anything happened to Carey. She stated that Charles's health was worsening but that she and Carey had decided that Charles should not be in a nursing home. When asked whether or if Charles's placement in a nursing home

would have made her life easier, Sherry stated that Charles would have wanted to be at home and that she was able to care for him.

Ranger Wells and Sergeant Martinez confronted Sherry about a $24,000 balance on a credit card in Carey's name. Sherry acknowledged that it was "her" debt, some of which was accrued by gambling, said she was making the minimum payments, though the balance had not been reduced, and told them that Carey knew about the $24,000 debt and did not give her any "trouble" about it. Sherry stated that Carey did not like credit cards and credit card debt. She stated that Carey "didn't care" about the debt and that she planned to pay off the debt herself. Sherry later admitted that she hid some of the credit card debt she had accrued from Carey. She told them that Carey did not want to divorce her and that the two had not fought before the murders.

In the final ten minutes of the interview, Ranger Wells and Sergeant Martinez asked Sherry whether she committed the murders. Sherry became upset and defensive, asserting that she did not do it and that she was angry at the accusation.

Within a few weeks of the murders, Gardner asked Tori for help in selling an "old .22" and asked her to call some gun shops. Tori avoided Gardner, thinking, "[W]ay to go daddy . . . sell some guns when they are missing from a murder scene." A few days later Tori saw Sherry either calling gun shops or looking for gun shops in the phone book and assumed that she was helping Gardner sell the .22.

Ranger Wells interviewed Tori on January 15, 2003. Ranger Wells discovered that, after the interview, Tori moved to Florida. Sherry, who had been living with Tori and

Gardner, stayed in the house with Gardner after Tori moved.

Sergeant Martinez later recovered a 25.06 caliber rifle from Bill Shipman in San Antonio.

The scientific evidence collected and tested did not yield any conclusive information about the identity of the murderer. The gun-shot residue testing on Sherry and Gardner did not show the presence of any residue.

The medical examiner collected some jacketing fragments from Charles's body, which were later submitted to a firearms and tool-mark examiner. The firearms and tool-mark examiner compared the autopsy fragments to jacketing samples obtained during test-firing of the 25.06 rifle recovered from Shipman in San Antonio. He concluded that the autopsy fragments had the "same general rifling characteristics" as the 25.06 rifle. They both had six lans and grooves with a right twist. While the autopsy fragments could have been fired out of the 25.06, the examiner stated that the autopsy fragments were damaged and therefore he could not make a positive identification.

A forensic biologist tested Sherry's clothing for trace evidence. She reported that the presumptive test on the bottom of the jeans Sherry had been wearing on December 7th indicated the presence of a very small amount of blood. She did not perform any confirmatory test because the amount of blood was so small. Subsequent DNA testing indicated that Sherry was a major contributor, Carey was a minor contributor, and Charles was excluded as a contributor. The most conservative calculation as to the chances that someone other than Carey was a contributor was one in 195. The analyst concluded that it

would not be unusual to find Carey's DNA on Sherry's pants since the two lived together.

**Gardner's Testimony**

At Sherry's trial, Gardner testified for the State. Ranger Wells interviewed Gardner for the first time on December 9th and, at that time, Gardner did not provide any information that would help the Sheriff's Office solve the murders. Gardner gave his first statement implicating Sherry on March 5, 2003. Gardner testified that he was currently serving time in the Grimes County Jail. Explaining the situation, Gardner testified that he was arrested on March 5th at Tori's house, when the Grimes County Sheriff's Office executed a search warrant for credit card records. He was on probation at that time for felony theft. The officers discovered drugs in his pocket and a .22 rifle from the Smith house in his room. He was charged with felon in possession of a firearm and possession of a controlled substance. At some point, he was charged with capital murder in relation to the murders of Charles and Carey. The capital murder charge was later dismissed. Shortly before Sherry's trial, he entered into a plea agreement with the State—he pled guilty to tampering with evidence and felon in possession of a firearm in exchange for his testimony at Sherry's trial and two years' confinement. The two years would run concurrent with the probation he was serving in Kimble county for felony theft. Because he had already served twenty months before Sherry's trial, Gardner would have only four more months of confinement.

Gardner testified that he helped Tori set up his travel trailer on the Smith's property. At first, his contact with Carey and Charles was uncomfortable because he was Sherry's ex-husband. When Tori moved, Gardner came to get the travel trailer from the Smith's

property. Gardner got along with Carey and Charles, and both men told Gardner that they loved Tori. Tori began to have some financial problems and problems with a man she was dating, so Gardner started to visit Tori more often to help her out. Gardner was also having problems with his third wife at the time. Gardner was aware that Sherry and Carey were helping Tori out financially.

When Gardner talked to Sherry about Tori's finances, the conversations were "negative." Gardner stated, "We argued about it a lot, about her having to help Tori. She couldn't do it. She couldn't make it. A lot of it[—credit card debt—]she was hiding from Carey." She did not know how Carey would react when he found out about the debt. Sherry complained to him that she felt smothered by Carey and Charles; she was unhappy and did not have a life. In September 2002, Sherry called Gardner while he was at his mother's house and complained about Tori because the two had been fighting. Sherry was stressed about her financial problems and talked about how she was the only one to help Tori. Sherry told Gardner that she had a solution to her financial problems. Gardner told her that he did not want to hear about it, and he felt that it was an "insinuation." Before Thanksgiving in 2002, the topic arose again when Sherry was visiting Tori's house. Sherry was frustrated with her marriage and said that she was "so frustrated she just wanted to kill them." Sherry told Gardner that she could shoot them, and Gardner told her that she lost her mind and would be playing God. Sherry then said that their health is "bad" anyway. When Gardner shook his head in disbelief, Sherry said that she could do it. At the time, Gardner thought that Sherry was just "blowing off steam."

Gardner stated that Sherry discussed her troublesome financial situation all of the time. During one of those discussions, Sherry brought up shooting Carey and Charles again, telling Gardner that she told him about a solution but that he refused to talk about it. She said that she needed a set of tire tracks to be at her house at a certain time. She said that she would tell Gardner when she would not be there and that she just needed someone to drive up. Gardner said he "cut off" the conversation. Again, Gardner believed that Sherry was "blowing off steam."

A few weeks later, Sherry approached Gardner and said that she had some guns to get rid of. Then on December 6th, Sherry told Gardner that she had the guns and asked him what to do with them. Gardner told her to put them in the back of the utility trailer he had next to Tori's house. She told him that she would be leaving early one morning to visit a family member in the hospital and would drop them off on her way.

On Friday, December 6th, Gardner stayed at Tori's house while she was at work with his truck. He used methamphetamine at this time and he dozed on and off until she got home on Saturday around 1:00 a.m. At about 4:30 a.m., while in bed, Gardner heard a vehicle drive up and saw headlights. Gardner went back to sleep and woke up again around 7:30 a.m. He noticed guns lying in the back of the trailer. Three rifles were wrapped individually in paper, one rifle was wrapped in a robe, and there were two rifles in a plastic case. Gardner put them in a non-working freezer in the garage. An hour later, Gardner went outside and inspected the guns. A 25.06 rifle with two spent shell casings inside of it was wrapped in a blue, terry cloth robe. He had a feeling that the guns came from Sherry, and he put them

back in the freezer.

Gardner hung out at the house until he drove Tori to work later that afternoon. When they got to the Diamond Shamrock, Sherry was there. Sherry came out to his truck. She immediately said, "I bet you didn't thank [sic] I could do it[,] did you." Gardner told her he did not want to talk about it and was in disbelief. When he went back to Tori's and saw Sherry, Sherry told him that she was going home. Gardner asked if Logan should stay with him in case there was anything that Logan did not need to see. Sherry told Gardner, "Logan is not going to see nothing." Sherry told Gardner that she would call him to come and pick up Logan when she got home. Sherry called Gardner in a panic and asked him to come and get Logan. Gardner headed to the Smith house and picked up Logan and took her back to Tori's.

Two days after the murders, Sherry told Gardner that she shot Carey and Charles. Gardner told her not to talk about it, but Sherry told him that she needed to tell someone. Sherry brought it up again two weeks later, telling Gardner that it had been hard to do and that she hated lying to Tori about it.

Gardner hid the guns and burned the paper and the bath robe on December 8th. After two to three weeks, he moved the guns to his mother's house. Sherry asked Gardner about the guns, and Gardner told her not to worry because he got rid of them. She told him not to sell two of them because they had serial numbers, and he told her that she did not have to worry about the .22 and 25.06. Gardner later took the 25.06, which he identified as the murder weapon, and another gun to San Antonio and gave them to his friend Shipman to

hold.

Sherry eventually gave Gardner a detailed description of the murders. She said that she shot Carey first, and Charles woke up and asked her about the noise. She told Charles that he was hearing things and to go back to bed. She waited for some time and then went into Charles's room and shot him, aiming towards his chest. She said she was wearing only the robe. Sherry told Gardner that she wrapped the 26.05 and the two spent shell casings in her robe and, while wearing nothing, took the guns out to her truck. She was concerned about this because she stepped up on the truck in her bare feet and did not know if she had transferred anything on the truck with her feet.

### Accomplice Witness Instruction

Based on the circumstances surrounding Gardner's testimony, Sherry's attorneys asked the trial judge to instruct the jury that he was an accomplice as a matter of law. The trial judge denied the request but instructed the jury to determine whether Gardner was an accomplice as a matter of fact.

## Court of Appeals

Sherry appealed to the Corpus Christi Court of Appeals. She alleged, among other things, that (1) the trial judge erred in denying her request to instruct the jury that Gardner was an accomplice as a matter of law, and (2) the non-accomplice testimony was insufficient to tend to connect her to the offense as required by Article 38.14, Texas Code of Criminal

Procedure.[2] The court of appeals sustained both points of error.[3] However, because the court found the evidence insufficient under Article 38.14, it did not address whether Sherry was egregiously harmed by the trial judge's failure to include an accomplice-as-a-matter-of-law instruction and it entered a judgment of acquittal.[4]

### State's Petition for Discretionary Review

The State petitioned us for review, challenging the court of appeals's decision on the sufficiency and charge issues. We granted the State's petition and granted the following ground for review on our own motion: What is the appropriate remedy if a court of appeals finds insufficient evidence to corroborate accomplice witness testimony?

With respect to the jury charge issue, the State asks that we abandon the automatic application of the accomplice as a matter of law rule when a witness has been indicted for the same offense as the accused. Alternatively, the State contends that it should not have to affirmatively establish on the record that the dismissal of the capital murder charge was not done in exchange for Gardner's testimony. The State contends that the court of appeals erred in concluding that Gardner was an accomplice as a matter of law because the record does not show that the capital murder charge was dismissed in exchange for Gardner's testimony. Second, with respect to the sufficiency issue, the State contends that the evidence was sufficient to tend to connect Sherry to the offense.

---

[2] 286 S.W.3d at 413.

[3] *Id.* at 423-39.

[4] *Id.* at 439.

## The Accomplice Witness Rule

The Legislature has determined that the factfinder should exercise caution when considering the testimony of an accomplice; "accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person."[5] Therefore, under Texas Code of Criminal Procedure Article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is corroborated by other, non-accomplice evidence that tends to connect the accused to the offense.[6] Evidence that the offense was committed is insufficient to corroborate an accomplice's testimony.[7] And an accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person.[8]

An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state.[9] Presence at the crime scene does not make a person an accomplice;[10] an accomplice must have engaged in an affirmative act that promotes

---

[5] *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998).

[6] TEX. CODE CRIM. PROC. ANN. art. 38.14.

[7] *Id.*

[8] *Brown v. State*, 320 S.W.2d 845, 847 (Tex. Crim. App. 1959).

[9] *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007) (citing *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004); *Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986)).

[10] *Kunkle*, 771 S.W.2d at 439.

the commission of the offense that the accused committed.[11] A person is not an accomplice if the person knew about the offense and failed to disclose it or helped the accused conceal it.[12] A State's witness may be an accomplice as a matter of law or as a matter of fact.[13] The evidence in each case will dictate whether an accomplice as a matter of law or fact instruction is required.[14] When the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly.[15] A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law.[16] But if the State dismisses the indictment before the witness testifies, the witness is no longer deemed an accomplice as a matter of law.[17] A witness continues to be regarded as an accomplice, however, if the witness agrees

---

[11] *Druery*, 225 S.W.3d at 498.

[12] *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987).

[13] *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006).

[14] *Id.*; *Blake*, 971 S.W.2d at 455.

[15] *Gamez*, 737 S.W.2d at 322.

[16] *Cocke*, 201 S.W.3d at 748; *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991); *Solis v. State*, 792 S.W.2d 95, 97 (Tex. Crim. App. 1990); *Herrera v. State*, 27 S.W.2d 211, 212 (Tex. Crim. App. 1930); *Chastain v. State*, 260 S.W. 172, 173 (Tex. Crim. App. 1924).

[17] *Garza v. State*, 296 S.W.2d 267, 268-69 (Tex. Crim. App. 1956) (citing *Herrera*, 27 S.W.2d at 212; *Crissman v. State*, 245 S.W. 438, 438 (Tex. Crim. App. 1922); *Jones v. State*, 214 S.W. 322, 329 (Tex. Crim. App. 1919)).

to testify against the accused in exchange for the dismissal of the charge.[18]  When there is doubt as to whether a witness is an accomplice (i.e., the evidence is conflicting), then the trial judge may instruct the jury to determine a witness's status as a fact issue.[19]  Finally, when the evidence clearly shows that a witness is not an accomplice, the trial judge is not obliged to instruct the jury on the accomplice witness rule—as a matter of law or fact.[20]

## Accomplice as a Matter of Law Instruction

Before testifying about the murders, Gardner testified on direct examination about the plea agreement he reached with the State before Sherry's trial:

Q: All right. What are you in jail for right now? What are you charged with?
A. Currently?
Q: Uh-huh.
A: Felon in possession of a firearm, possession of a controlled substance.
Q: Okay. Did you have some other charges previously pending against you that are dismissed now?
A: Yes, sir.
Q: And what was that?
A: Capital murder times two.
Q: Okay. Now you're testifying today under a plea agreement, right?
A: Yes, sir.
Q: All right. I want you to tell the jury what that plea agreement is?
A: Plea agreement is to plead to tampering with evidence or felon with a firearm. I'm on probation. It would be run concurrent with it.
Q: Let's back up. You're on probation where?
A: In Kimble County.
Q: Do you know what you're on probation for?
A: I thought it was felony theft.

---

[18]  *Oates v. State*, 86 S.W. 769, 772 (Tex. Crim. App. 1905); *Barrara v. State*, 42 Tex. 260, 264 (Tex. Crim. App. 1874).

[19]  *Druery*, 225 S.W.3d at 498-99; *Gamez*, 737 S.W.2d at 322.

[20]  *Gamez*, 737 S.W.2d at 322.

Q: Okay. So you're on probation in Kimble County and you have two other felony charges here. And what is going to happen on those charges if you – – as part of your agreement to testify?
A: I've got TDC time coming.
Q: How much?
A: Two years.
Q: You going to get credit for the time you have been in jail?
A: Yes, sir.
Q: So, you got two years confinement with about twenty months credit?
A: Yes, sir.
Q: And what about the Kimble County case? Is there an agreement to take care of that, also?
A: Yes, sir. To run concurrent.
Q: That means that it all runs together.
A: Yes, sir.
Q: So the net effect is you're going to get two years in prison and you have already done twenty months of it?
A: Yes, sir.

On cross-examination by Sherry's counsel about the plea deal, Gardner testified as

follows:

A: I got a deal?
Q: Yes.
A: I made a plea bargain.
Q: You got a deal?
A: A plea bargain.
Q: That's right. You're going home in March, aren't you?
A: Supposed to.
Q: Supposed to?
A: Yes.
Q: All depends on what you say to this jury isn't it?
A: No, sir.
Q: You already made your deal haven't you?
A: Yes, sir.
Q: You went, did you not, from a capital murder times two indictment to going home in March don't [sic] you?
A: Yes, sir.

The court of appeals held that the evidence in the record clearly demonstrates that the

capital murder indictment was dismissed in exchange for Gardner's guilty plea in the other cases and his testimony at Sherry's trial.[21] As a result, the court concluded that Gardner was an accomplice as a matter of law and that the trial judge therefore erred in denying his request to instruct the jury as such.[22]

We disagree with the court of appeals's construction of the record. As recognized above, to be entitled to an accomplice as a matter of law instruction, the evidence must leave no doubt that a witness is indeed an accomplice as a matter of law.[23] Although the standard appears absolute, the trial judge has some discretion when logical inferences, supporting conflicting views of the evidence, may be drawn from the record. When a logical inference from the record may be made, though not a necessary inference, it is improper to overrule a trial judge's determination that a defendant is entitled to an accomplice witness as a matter of law instruction.[24] Here, the court of appeals made an impermissible inference—one

---

[21] *Smith*, 286 S.W.3d at 423.

[22] *Id.*

[23] *Druery*, 225 S.W.3d at 498; *Gamez*, 737 S.W.2d at 322.

[24] *See, e.g., Irby v. State*, PD-1097-08, 2010 Tex. Crim. App. LEXIS 725, 48-49 (Tex. Crim. App. June 16, 2010) ("we agree with the trial judge and court of appeals that appellant failed to make a logical connection between W.P.'s testimony concerning his sexual encounters with appellant and his entirely separate probationary status. Thus, the trial judge did not abuse his discretion in excluding this impeachment evidence because it was irrelevant."); *Hammons v. State*, 239 S.W.3d 798, 805 (Tex. Crim. App. 2007) ("There is no bright line between a general challenge to memory or credibility and a suggestion of conscious fabrication, but the trial court should determine whether the cross-examiner's questions or the tenor of that questioning would reasonably imply an intent by the witness to fabricate.").

explicitly rejected by the trial judge—that the State dismissed the capital murder charge in exchange for Gardner's guilty pleas and testimony. While it is possible to infer that from the testimony, it is not a necessary inference, and the trial judge was not bound to find Gardner to be an accomplice as a matter of law. There was no evidence that the capital murder indictment was dismissed as part of a package deal, i.e., in exchange for Gardner's guilty pleas to possession of a controlled substance and possession of a firearm by a felon—which were not lesser-included offenses of capital murder—and his testimony implicating Sherry. What the record does show is that the capital murder charge against Gardner was dismissed and that Gardner eventually entered into a plea agreement with the State on the two unrelated charges in exchange for his testimony against Sherry. The court of appeals erred to find a necessary inference, contrary to the trial judge's reasonable understanding of the evidence, that the State's dismissal of the capital murder charge was connected to the plea agreement it ultimately entered into with Gardner. Without any concrete evidence in the record showing that the State dismissed the capital murder charge in exchange for Gardner's testimony,[25] we cannot say that the trial judge erred in doubting Gardner's status as an accomplice as a matter of law.

Because the trial judge's ruling is supported by the record, it is not necessary for us to render a decision on the State's first ground for review—whether we should abandon the automatic application of the accomplice witness as a matter of law rule to a State's witness

---

[25] *Druery*, 225 S.W.3d at 498; *see Oates*, 86 S.W. at 772; *Barrara*, 42 Tex. at 264.

indicted for the same offense as the accused. Therefore, we dismiss that ground as improvidently granted.

**Sufficiency of Non-Accomplice Evidence**

When reviewing the sufficiency of non-accomplice evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense.[26] The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case.[27] The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense.[28] So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence.[29] Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence.[30]

On appeal, the State relied on the following non-accomplice evidence to satisfy Article 38.14: motive, opportunity, and Sherry's demeanor and actions before and after the

---

[26] *Brown v. State*, 672 S.W.2d 487, 488 (Tex. Crim. App. 1984).

[27] *Reed*, 744 S.W.2d at 126.

[28] *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988).

[29] *Simmons*, 282 S.W.3d at 508.

[30] *Id.* at 509.

offense.[31]   Taking a divide and conquer approach, the court of appeals discounted each

theory.[32]  The court's approach, however, is incorrect under our case law requiring reviewing

courts to consider the combined force of all of the non-accomplice evidence that tends to

connect the accused to the offense.[33]   We also observe that the court of appeals, in

individually discounting each of the State's arguments, failed to defer to the jury's view of

the facts.  The court of appeals improperly supplanted the jury's verdict with its own view

of the evidence, offering alternative, seemingly innocent explanations in certain instances,

in direct opposition to the jury's implicit determination in this case.[34]

Affording proper deference to the jury's fact resolution, we conclude that the non-

accomplice evidence was sufficient to tend to connect Sherry to Carey and Charles's

murders.   Motive and opportunity evidence is insufficient on its own to corroborate

accomplice-witness testimony, but both may be considered in connection with other evidence

that tends to connect the accused to the crime.[35]   Similarly, "'proof that the accused was at

or near the scene of the crime at or about the time of its commission, when coupled with

other suspicious circumstances, may tend to connect the accused to the crime so as to furnish

---

[31] *Smith*, 286 S.W.3d at 424.

[32] *See id.* at 427-434

[33] *Mitchell v. State*, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983).

[34] *See Simmons*, 282 S.W.3d at 508.

[35] *Reed*, 744 S.W2d at 127; *Gill*, 873 S.W.2d at 49.

sufficient corroboration to support a conviction.'"[36]

The non-accomplice evidence shows that Sherry had both the motive and opportunity to kill Carey and Charles and that Sherry was present at the time of the murders.

The jury could have concluded the following:

We begin with motive. For a number of reasons, Sherry's life circumstances were on the verge of an adverse climax before the murders. Her marriage, which began as one of mutual convenience, was becoming increasingly burdensome physically and emotionally when combined with Sherry's other interests and obligations. Charles's health was declining further, and he required more of Sherry's time and attention. Carey suffered from some medical problems due to his weight; Sherry told Tori that he would not live much longer. At the same time, Sherry helped care for her dying aunt and assumed the responsibility of caring for Logan while Tori worked and socialized. Sherry's time away from the Smith household caused friction between Sherry and Carey. Tori testified about how Sherry talked harshly to Carey when Sherry was at Tori's house and Carey wanted her to return home. Sherry stated that Carey did not even like it when she stayed away from home at the hospital with Charles. Further, Sherry's resentment about her financial dependance on Carey was becoming increasingly apparent. Sherry indicated that she wanted out of the marriage but told Tori that she did not know where to go or what to do. In brief, a rational jury could have determined that the evidence concerning the marriage indicated that Sherry was at a breaking

---

[36] *Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993) (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)).

point; she was stressed and exhausted.

Without informing Carey, Sherry had also accumulated a large amount of debt with credit cards obtained in his name. Sherry was undoubtedly aware that she was putting herself in a precarious position. She had spent her retirement money, did not have a job and was therefore not earning any money, and she admitted to Valadez that she was struggling to make the minimum payments on the cards. From the evidence, it can be inferred that Sherry was concerned that Carey would eventually find out about the cards issued in his name without his knowledge, the debt, and Sherry's concerted efforts to conceal it all from him. Carey disliked the notion of credit card debt, and Carey and Charles were depicted as hard-working, honest people; thus, it can also be inferred that Carey would have reacted badly had he discovered the betrayal. Sherry's financial security was in jeopardy.

Additionally, Sherry had a renewed romantic interest in Gardner and believed that there was a chance of a reconciliation between them.[37] Sherry began to spend more time at Tori's when Gardner was there. And she revealed to Tori that she loved Gardner and that the two had kissed. Sherry also told her friend Johnson that Gardner was a "changed person" and that the two could possibly get back together.

Finally, Carey's will bequeathed the Smith property and house to Sherry. The attorney who prepared both Carey's and Charles's wills testified that a layperson, i.e., a person like Sherry, who did not know the law, would likely have believed that if both men died, even at

---

[37]   *Cf. Reed*, 744 S.W2d at 126-27 (evidence of an affair may be considered with other inculpatory, non-acconclice evidence).

the same time, the Smith house and property would then belong to Sherry.

Regarding opportunity and Sherry's presence at the scene of the crime, the evidence strongly suggests that Sherry was the only one at home with Carey and Charles when the two were shot. Sherry was at home shortly before 4:00 p.m. on the 6th, when Tori dropped off Logan, until 4:00 a.m. on the 7th, when she left for Wal-Mart. Based on the evidence, it is reasonable to infer that Carey and Charles were dead before Sherry left the house at 4:00 a.m. on the morning of the 7th. The evidence shows that Carey and Charles had been dead for at least eight to twelve hours. The medical examiner testified that livor mortis was fixed in both Carey and Charles and that it takes approximately eight to twelve hours, and as much as twenty hours, to become fixed after death. Thus, the latest time on the 7th that the two could have been shot was 9:00 a.m., with the earliest time being 9:00 p.m. on the evening of the 6th. Carey was on the phone with Kowis at 9:00 p.m. on the 6th, however. The evidence establishes that Carey and Charles were shot while they slept. And Tori testified that Carey was usually up in the morning before 7:30 a.m. Sherry told Ranger Wells and Sergeant Martinez that Carey was usually up before 7:00 a.m. Sherry told investigators that the garage light she had turned on before she left in the morning was still on when she returned home. Sherry told Ranger Wells and Sergeant Martinez that Carey and Charles were conscious of lights being left on and usually turned the lights off and generally kept the house dark. Also, on the morning of the 7th, between 7:30 and 7:45, the Smith's next door neighbor, George Sarondos arrived at his property in Grimes County, having traveled from Houston. He saw the two trucks belonging to Carey and Charles parked on the Smith property. He did not see

Carey or Charles, though he had seen Carey outside the week before. Sarondos bailed hay outside from 8:00 to 9:00 and then went inside his house for a few hours before he headed back to Houston between 10:00 and 10:30. He did not see anyone on the Smith property and did not hear any gun shots, which he would have heard had a gun been fired in the vicinity. Sarondos testified that he did not always see Carey or activity on the Smith property when he visited his property.

Sherry's motive and presence at the crime scene should not be considered in the abstract as mere theories. The evidence establishing both was overwhelming. When motive and opportunity are considered, all things point to Sherry as the perpetrator and nobody else. Sherry had numerous reasons to kill Carey and Charles—to escape an unsatisfying and burdensome marriage that was draining her physically and emotionally, to avoid Carey's inevitable discovery of the debt that Sherry accrued in his name without his knowledge and which she had no means to repay, to rekindle an old romance with Gardner, and to secure financial stability for herself, Tori, and Logan. The timing and circumstances surrounding Carey's and Charles's deaths also established that Sherry was the only person who could have shot the two men while they slept.

Next, because motive and opportunity are insufficient on their own to tend to connect Sherry to the murders, we turn to additional evidence—or circumstances that raise suspicion—tending to connect Sherry to the murders.

First, Sherry's behavior before and after the murders constitutes an independent circumstance that tend to connect her to the murders. In judging Sherry's behavior before

the murders as incriminating or suspicious, we note an overlap with some of the evidence discussed above with respect to Sherry's motive. Motive, which explains why Sherry murdered Carey and Charles,[38] is distinct from her malevolent behavior and bitter attitude, which, in this case, are indicative of guilty conscience.[39] As such, the evidence of Sherry's attitude and behavior that is inextricably intertwined with the motive evidence serves a secondary, incriminating purpose.

From the outset of her relationship with Carey, Sherry talked about using Carey for his money and inheriting his property. Sherry certainly followed through on her intentions to use Carey for financial gain. She quit her job, exhausted her retirement fund, lived off of Carey and Charles, and then deceived Carey by taking out numerous credit cards in his name without his knowledge. Reasonable jurors could have determined that Sherry also finalized her inheritance prediction. On several occasions, to different people, Sherry overtly expressed the ultimate goal behind her marriage—to inherit the Smith house and property. She was looking forward to the day that she would be "set up," without the obligations attached to her marriage.

Sherry's relationship with the Smiths deteriorated considerably before the murders.

---

[38] *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) (stating that "[m]otive is a significant circumstance indicating guilt" when analyzing the legal sufficiency of the evidence).

[39] *Cf. Gill*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (defendant's secretive actions after the offense used as a corroborating circumstance); *Cawley v. State*, 310 S.W.2d 340, 342 (Tex. Crim. App. 1957) (evidence of flight is a corroborating circumstance because it is indicative of a consciousness of guilt).

In the beginning, Sherry was content with the marriage; she fulfilled her obligations by taking good care of the house as well as of Carey and Charles; the three had maintained a pleasant status quo. Shortly before the murders, however, things had changed. The evidence shows that Sherry began to treat Carey and Charles poorly; she increasingly demonstrated little respect and patience for both men. Teresa Kott, a friend of Charles's from church, would visit Charles at least once a month. She described the interaction between Sherry and Charles early on as "picking and laughing . . . in a playful kind of way." Towards the end, Kott stated, the relationship was "a little more serious, less playful." Tori testified that in December 2002, when she talked to Sherry about her relationship with Carey and Charles, Sherry "was getting tired" and "wasn't very happy." "She said that if she left she didn't know where she would go or what she would do." Tori stated that when Carey called her house looking for Sherry, Sherry "talked kind of ugly, like I will be home when I get home." And a month before the murders, when Sherry was at Tori's "hanging out" and Carey came to Tori's to tell Sherry to come home, Sherry was "ugly." Charles's home-health care nurse, Simick, treated Charles during the six months before he was murdered. She stated that there was always a lot of stress and tension in the household. Sherry would get "irritated" with Charles.

The evidence also showed that Sherry exhibited strange behavior after the murders. After hearing about Carey's and Charles's murders, Carey's friend Glen Love drove to the Smith house to see what was going on. At this time, one of the investigators asked for "Mrs. Smith." Sherry responded in a "joking manner" with a "sort of grin" and identified herself

as "Ms. Whitmire," which was her maiden name. After that Sherry said, "I'm Mrs. Smith." Sherry's friend Johnson also went to the Smith house at Sherry's request. Johnson observed that Sherry was upset, but Johnson "felt that [Sherry] wasn't upset enough."

Further, during Sherry's recorded interview with Ranger Wells and Sergeant Martinez that night, which was played for the jury, Sherry made several mean-spirited remarks, couched in a tone of either underlying disdain or inappropriate humor. There can be little doubt that this would have been lost on the jury. When Sherry recalled the garage light still being on when she returned home, she stated that Carey and Charles were "misers" and opined that the two "liked to live in a morgue." She stated that she "couldn't stand it." When Sherry explained why she was scared to touch Carey's body, she stated that Carey is a "big man" and that she was shocked by blood on his "big old face." Sherry also commented on the overflowing trash in Carey's garbage can, stating, with a chuckle, that it was "just like [Carey] overflowed." Sherry also unexpectedly volunteered information about her non-existent sex-life with Carey. While explaining why Carey did not "nag" her about having sex, Sherry surmised that it was because Carey had not had sex for most of his life. When investigators were concluding the interview, Sherry hastily asked them not to think that it was "weird" that the two did not have sex. She stated that their marriage was not about sex. Sherry then asked the following rhetorical question with a laugh: "[W]ho wants that fat thing all over you?"

Sherry also complained and joked about losing her clothes when she agreed to give them to Ranger Wells and Sergeant Martinez, stating that they were "ripping [her] off."

Sherry stayed with Tori after the murders, and Tori observed Sherry's demeanor in the following weeks. When they returned home from the police station after Sherry was first interviewed, Tori stated that Sherry went to talk to Gardner outside because, according to Sherry, Gardner "understood her." In the days after the murders, Sherry did not cry; she kept busy to keep her mind off of things. Sherry also recalled the details of her whereabouts and discovery of the bodies to her mother, directing her mother to write it down so that when she was questioned again by investigators she would not become confused. Sherry, along with Gardner, warned Tori to be careful about what she said to investigators because it could "incriminate" Sherry.[40] They urged Tori not to offer any information but to simply answer the questions. Tori testified that she did not believe that Sherry's reaction following the murder was "typical of someone who was grieving."

Sherry also continued to accrue debt in Carey's name after the murders. Sherry still used the credit cards that Carey had not known about. The statements, some of which were still being delivered to Johnson's Post Office Box, indicate that Sherry used the cards for cash advances, personal items, and to pay other bills.

Finally, viewed rationally, the non-accomplice evidence may be construed to connect Sherry to the guns taken from the Smith house. The guns owned by the Smiths went missing at the time of the murders. Sherry told Investigator Schroeder that the gun rack had been "full," establishing that the guns had not been missing before the murders. Carey's nephew

---

[40] *Cf. Simmons*, 282 S.W.3d at 510 ("A jury could also rationally find that appellant's attempt to get Johnson to sign an affidavit exonerating appellant was a suspicious circumstance.").

testified that he was familiar with the guns kept at the Smith house; he visited the Smiths monthly. He testified that the Smiths had three .22's. At trial, he identified State's Exhibit 202, a JC Higgins .22 rifle, stating that it belonged to the Smiths and that he had seen it on the gun rack in the Smith house when he visited shortly before Thanksgiving in 2002. Investigators recovered the JC Higgins .22 rifle from Tori's house on March 5th, the day Gardner was arrested. Ranger Wells found the .22 rifle in the closet in Gardner's room. And during a subsequent search of the premises the next day, Investigator Higginbotham found a .22 Deeringer pistol in a backpack stored in the garage. The backpack also contained some camouflage clothing, a mask, a flashlight, and some other items.

At trial, Tori testified that a few weeks after the murders, Gardner asked her, in Sherry's presence, to help him call a couple of local gun shops because he had an "old .22" and "needed some money." This prompted Tori to question Gardner's judgment, given the missing guns from the Smith house. Nevertheless, Tori "told them the information and let it go." A few days later, Tori observed Sherry either calling gun shops or looking up gun shops in the phone book.

Although investigators found two .22's, a rational jury could have inferred that Gardner and Sherry were trying to sell the Smith's .22 rifle. Sherry's involvement in helping Gardner sell the .22 on the heels of the murders suggests that Sherry had a personal interest in disposing of the gun. A jury could therefore reasonably infer that Sherry, who had claimed to have no knowledge during the interrogation about the guns taken from the Smith house at the time of the murders, was the one who removed the .22 rifle and consequently the other

guns from the house.[41]

In summary, beyond the motive and opportunity evidence, the jury was confronted with additional incriminating evidence tending to connect Sherry to the murders. Sherry's attitude towards Carey and Charles shifted before the murders. She became unhappy with her life with both men. And this attitude carried over after the murders. She did not grieve the murders as would be expected from a widow, and the people around her noted the unusual reaction. The jury also heard, firsthand, the callous comments that Sherry made about Carey and Charles to Ranger Wells and Sergeant Martinez. Finally, the evidence strongly indicated that Sherry had disposed of the guns taken from the Smith house on the night of the murders. Though each of the facts discussed above, considered individually, would not satisfy Article 38.14, the cumulative force of the non-accomplice evidence, giving proper deference to the jury's resolution of the facts, tends to connect Sherry to the murders of Carey and Charles. The court of appeals therefore erred to hold otherwise. Consequently, we need not decide what the appropriate remedy is when a court of appeals finds insufficient evidence to corroborate accomplice witness testimony. This ground, granted on our own motion, is also dismissed as improvidently granted.

**Conclusion**

We hold that the trial judge did not err in refusing to instruct the jury that Gardner was an accomplice as a matter of law. The evidence at trial failed to definitively establish that

---

[41] *Cf. Hernandez v. State*, 939 S.W.2d 173, 178 (Tex. Crim. App. 1997); *Gill*, 873 S.W.2d at 49.

the State dismissed the capital murder charge against Gardner in exchange for his testimony at Sherry's trial. We also hold that the court of appeals erred in concluding that the non-accomplice evidence was insufficient to tend to connect Sherry to the murders as required by Article 38.14, Texas Code of Criminal Procedure. We reverse the court of appeals's judgment and remand this case to the court of appeals to address Sherry's remaining points of error.

DATE DELIVERED: February 2, 2011
PUBLISH