

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---
**NO. PD-0791-08**
---

**JIMMY LEE SIMMONS, Appellant**

**v.**

**THE STATE OF TEXAS**

---
**ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE THIRD COURT OF APPEALS
MILAM COUNTY**
---

**HERVEY, J., delivered the opinion for a unanimous Court.**

**O P I N I O N**

Article 38.14, TEX. CODE CRIM. PROC., provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice without other corroborating evidence "tending to connect" the defendant to the offense. In this case, the court of appeals, with one justice dissenting, reversed appellant's aggravated-robbery conviction and acquitted him after deciding that the non-accomplice evidence did not tend to connect appellant to the offense.[1] We decide that a rational

---

[1] *Simmons v. State*, No. 03-06-00379-CR slip op. at 7-8 (Tex.App.–Austin, delivered April 10, 2008) (unpublished memorandum opinion).

juror could have found that the non-accomplice evidence did tend to connect appellant to the offense.

Appellant, Jimmy Lee Simmons, was convicted of aggravated robbery and sentenced, as an habitual offender with a prior robbery conviction, to serve twenty years in prison and to pay a $1,000 fine. The evidence shows that Justin Mendoza and his pregnant girlfriend were robbed at around 1:00 a.m. on November 15, 2005, by an individual whom Mendoza knew and identified to the police as Lamar Johnson (the accomplice witness) and a gun-wielding, masked man who said various things to the robbery victims during the robbery. Mendoza was unable to visually identify the masked man. He did, however, tell a police investigator (Smith) that the voice of the masked man sounded like the voice of a "Jimmy Lee," who had asked Mendoza and his friend for a ride the afternoon before the robbery, but that he was not "sure" or "positive."[2]

> Q. [STATE]: Now, Mr. Mendoza, were you ever able to identify or tell the police who the man in the mask was?

---

[2]

Mendoza's friend, who went unnamed at appellant's trial, did not testify. We also note that Mendoza was never asked whether, and therefore never testified that, appellant was the "Jimmy Lee" who asked for a ride the day before the robbery. We further note that the defense argued to the jury that no evidence showed that appellant was this "Jimmy Lee."

> [THE DEFENSE]: [The State] brought up something and a light bulb goes off. I didn't sleep very well last night thinking about this. Mr. Mendoza said he thinks the next day they gave a guy a ride and he didn't know the guy, but the friend said, "That's Jimmy Lee." And the voice–and he says, "I'm not sure"–sounded like that guy Jimmy Lee. You know what? Where's that friend who was in the car that could sit right there and say, "When I said Jimmy Lee, I meant him"? Where's that guy? How many Jimmy Lees are there? "It sounded like Jimmy Lee, but I'm not sure it was Jimmy Lee," and he never said it's this Jimmy Lee.
>
> And it just went off when [the State's] talking about the friend said that's Jimmy Lee. [Mr. Mendoza] didn't know the guy. Where's that guy to say Jimmy Lee equals Jimmy Lee Simmons equals the man in that chair?

A. [MENDOZA]: No, ma'am, not at the time that it had happened. But the next day, I was able to talk with Officer Smith and we–how do I say–we kind of was going through some names and whatever and then some voices, and then I noticed that a voice had sounded very familiar to me.

Q. So you told Officer Smith that you thought you might be able to–you recognized the man's voice?

A. Yes, ma'am.

Q. Okay. Can you tell the jury a little bit about the man with the gun, his voice and who you thought it might be.

A. Okay. Well, earlier that morning, I was giving a friend a ride, and another guy flagged us down wanting a ride to Sonic. And his exact words were, "Can you give me a ride to Sonic? My order is already called in." And I didn't ever speak to the man; my friend did. So after we left, I asked him who that was, and he said it was Jimmy Lee.

Q. Okay. And there was something about--

A. Yes. Whenever we were in the house and I was telling him to let my girlfriend go, the man with the mask on said, "Stop pleading, stop pleading." And then I told Officer Smith–I said that that voice sounded like Jimmy Lee's whenever he said that.

Q. Okay. But you're not sure?

A. Yeah. No, I'm not sure.

\* \* \*

Q. [DEFENSE]: You said the next day, you went through some names and some voices, but you said it might be Jimmy Lee?

A. Yes, sir. I said--

Q. But you're not positive?

A. No, I wasn't positive, sir. I said it might be.

Johnson was arrested and told the police that appellant, who dated Johnson's mother, was the other robber wearing the mask. This information resulted in appellant's arrest. Johnson testified at appellant's trial that he pled guilty to aggravated robbery in exchange for a non-aggravated, five-

year sentence and that appellant was the gun-wielding, masked man. Johnson claimed that his participation in the offense was minimal.

Johnson also testified that, while he and appellant were in jail awaiting trial, appellant wrote Johnson a letter. This letter was admitted into evidence and it states:

> Mor, I don't know what the fucc is on your mind. What the fucc kind of shit or you doing. You talking to tha laws. So now you work for them. That's so ho ass shit my case is beat im not doing know trippin. I was tring to make a way so yours would be beat, but you go in snitch on your self and others. You claim to be a Gangsta but you don't even realize what the "G" stand for. I'm going to handle my legal work so after I write up a alphadavit im going to need you to read and sign it. Why would you bring me down if you had any love for me. You put my name in this shit and only you. You only care about you and that's bullshit man–that type of shit gets people killed. You put my life on the line cause you trippin. Holla bacc at me.

("sic" omitted throughout).

Johnson testified that he felt threatened by this letter. The evidence also shows that Johnson refused to sign an affidavit that appellant prepared stating that appellant was not involved in the robbery. Other evidence showed that appellant presented an affidavit purportedly bearing Johnson's signature to two jail employees and asked them to sign the affidavit attesting that they witnessed Johnson sign it. They declined to do so because they did not see Johnson sign the affidavit. Appellant also declined an offer by one of these jail employees to prepare another affidavit and witness Johnson sign it in her presence.

The court of appeals decided that Mendoza's testimony that the masked man's voice sounded like the voice of the "Jimmy Lee" who asked Mendoza and his friend for a ride the day before the robbery was insufficient to connect appellant to the robbery because Mendoza was "not sure" that these voices belonged to the same person and also because the evidence did not show that appellant was this "Jimmy Lee." *See Simmons*, slip op. at 5-6. The court of appeals also decided that

appellant's letter to Johnson did not tend to connect appellant to the offense because this letter merely chastised Johnson for giving appellant's name to the police and contained no admission by appellant to any involvement in the robbery. *See Simmons*, slip op. at 6. The court of appeals also decided that appellant's attempt to get Johnson to sign an affidavit exonerating appellant "could be construed as the efforts of an innocent man, currently facing serious criminal charges, to clear his name." *See Simmons*, slip op. at 7 ("We hold that Johnson's accomplice testimony was not properly corroborated by (1) Mendoza's testimony that the voice of the man who robbed him 'might' belong to a man his friend identified as 'Jimmy Lee,' (2) a letter from [appellant] to Johnson that does not admit guilt but merely expresses anger at being implicated in a crime, and (3) an attempt by [appellant] to get Johnson to sign an affidavit swearing to [appellant's] innocence. Considered collectively, these combined factors do not tend to connect [appellant] with the commission of the offense.").[3]

We exercised our discretionary authority to review this decision. The State claims in its ground for review that this Court should adopt the dissenting opinion in the court below. *See Simmons*, slip op. at 1-4 (Waldrop, J., dissenting).[4] This dissenting opinion contends that the

---

[3]

We note that the court of appeals' opinion does not address what the State characterizes as appellant's attempts to suborn perjury by having two jail employees falsely swear that they witnessed Johnson sign an affidavit exonerating appellant.

[4]

The State argues in its ground for review that:

[t]he court of appeals erred in analyzing the quantum of evidence necessary to corroborate accomplice witness testimony under [Article 38.14] as whether the corroboration could just as rationally be equated with innocence as it could with guilt, rather than whether a rational juror could find that the corroborating evidence tended to connect appellant to the offense charged, as is illuminated in the dissenting opinion.

majority applied an incorrect standard in determining whether the non-accomplice evidence tended to connect appellant to the offense by making its own independent interpretation of the evidence and rejecting a reasonable interpretation of the evidence that would have satisfied the "tending to connect" the defendant to the offense standard in Article 38.14. *See Simmons*, slip op. at 2-4 (Waldrop, J., dissenting). This dissenting opinion further contends that appellate courts should defer to the jury's assessment of the evidence if reasonable minds can differ on whether non-accomplice evidence tends to connect a defendant to the offense. *See Simmons*, slip op. at 2 (Waldrop, J., dissenting). For example:

> The most significant piece of corroborating evidence is the letter appellant wrote to Johnson in jail. The majority concludes that the letter "does not necessarily connect [appellant] with the commission of the offense." However, this is not the standard for testing non-accomplice evidence. The standard is whether the evidence could be viewed by a rational juror as tending to connect the defendant to the offense committed. [Citation omitted]. Therefore, the correct inquiry is not whether the letter could rationally be interpreted consistent with innocence. The correct inquiry is could the letter be rationally interpreted as tending to connect the writer with the offense committed? If so, we are bound to affirm the jury's assessment of the evidence.

*See id*.

We agree. In determining whether non-accomplice evidence tends to connect a defendant to the offense, we have stated that "the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *See Malone v. State*, 253 S.W.3d 253, 257 (Tex.Cr.App. 2008) (internal quotes omitted); *Holladay v. State*, 709 S.W.2d 194, 199-200 (Tex.Cr.App. 1986) (citing with approval an Evidence Treatise stating in part, "Confirmation as to the defendant's connection to the offense, however, should be by independent evidence from which

the jury may reasonably be satisfied, apart from the accomplice's testimony, the defendant's connection to the offense.").[5] Thus, when there are two permissible views of the evidence (one tending to connect the defendant to the offense and the other not tending to connect the defendant to the offense), appellate courts should defer to that view of the evidence chosen by the fact-finder. *See Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) (when there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous); *Evans v. State*, 202 S.W.3d 158, 163 (Tex.Cr.App. 2006) (same).

The issue then is not how an appellate court would independently assess the non-accomplice evidence but whether a rational fact-finder could conclude that the non-accomplice evidence "tends to connect" appellant to the offense. Initially, we note that a jury could rationally find that the masked man's first and middle names were "Jimmy Lee," which coincidentally are also appellant's first and middle names. Mendoza testified that the voice of the masked man sounded like the voice of the "Jimmy Lee" who asked Mendoza and his friend for a ride just hours before the robbery.

---

[5] *See also Nash v. State*, 134 S.W. 709, 717-21 (Tex.Cr.App. 1911) (op. on State's mot. for reh'g) (stating, among other things, "Mr. Webster's definition of 'tend' or 'tending' is: 'To stretch, extend, direct one's course; to be directed as to any end, object or purpose; to aim; to have or give a leaning.' Therefore, we would gather from this article that if the circumstances lead toward, or tend toward, the defendant as the party who committed the offense, and show the truth of the prosecutrix, this would be all the law required."); *Andrews v. State*, 370 So.2d 320, 322 (Ala.Crim.App. 1979) ("The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. 'Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, [in]criminating force of his testimony.' The corroborative evidence need not be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Corroborative evidence need not directly connect the accused with the offense but need only to tend to do so.") (citations to authority omitted).

Mendoza's uncertainty about whether these voices were the same went "to the weight of the testimony and not to its admissibility." *See Jenkins v. State*, 484 S.W.2d 900, 902 (Tex.Cr.App. 1972) (fact that non-accomplice witness "cannot be positive in his identification goes to the weight of the testimony and not to its admissibility"). Though this evidence by itself may not sufficiently tend to connect appellant to the offense (an issue we need not decide in this case), this evidence may, with other suspicious circumstances, "furnish sufficient corroboration to support a conviction." *See Malone*, 253 S.W.3d at 257 (defendant's mere presence at the crime scene is insufficient to tend to connect the defendant to the crime but this, "when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction") (internal quotes omitted).[6]

---

[6]

The State also argues that, even if the court of appeals "was narrowly correct in its analysis of the voice identification by Mendoza, that evidence cannot be considered in a vacuum," and it must be considered in conjunction with the other non-accomplice evidence.

> In the instant case, the Court below examined each of the three pieces of evidence that it identified as non-accomplice evidence, in a piecemeal, isolated fashion, and found each of them insufficient to connect Appellant to the crime. The first piece of evidence, Mendoza's testimony that "Jimmy Lee's" voice sounded like the masked assailant, was found wanting because the identification lacked total certainty. If that had been the only evidence, then it would not have met the threshold. But there are three additional factors to consider. One, Mendoza heard the voice of the hitchhiker on the very day of the robbery, not at some remote point in time when his memory might have faded. Two, appellant, Jimmy Lee Simmons, lived in Cameron, not a large city like Houston, where there might be hundreds of "Jimmy Lee's." Three, appellant was dating the accomplice's mother. When these three factors are considered together, they logically connect Appellant to the accomplice and to the crime, because they make it more likely that Jimmy Lee the hitchhiker, whose voice Mendoza recognized during the robbery, was Jimmy Lee Simmons, who was dating the mother of the other robber. And even if the Court below was narrowly correct in its analysis of the voice identification by Mendoza, that evidence cannot be considered in a vacuum. It must be considered in conjunction with the other corroborating evidence: the jail letter and the purported affidavit.

To this end, a jury could rationally find that appellant's letter to Johnson was a suspicious circumstance. Although a rational juror could, as the court of appeals stated, find that appellant's letter was an innocent person's expression of frustration to Johnson for having been implicated in the offense, a rational juror could also find that appellant's letter was a threat to Johnson, particularly since Johnson testified that he felt threatened by the letter.[7] *See Burks v. State*, 876 S.W.2d 877, 888 (Tex.Cr.App. 1994) (defendant's threats to his aunt when she said that she would call the police if she found out that the defendant was involved in the offense was evidence that tended to connect the defendant to the offense); *Simmons*, slip op. at 3 (Waldrop, J., dissenting) ("It would not be irrational to view ... statements [in appellant's letter] as possibly expressing frustration that Johnson had cut a deal with the State to truthfully 'snitch' on appellant, that 'ganstas' do not do that to each other, and such a thing might have serious consequences for the snitch. Interpreted this way, the letter tends to connect appellant to the offense.").[8]

---

[7] For example, appellant's letter to Johnson stated:

> You put my name in this shit and only you. You only care about you and that's bullshit man–that type of shit gets people killed.

*See also Simmons*, slip op. at 3 (Waldrop, J., dissenting) (setting out and claiming that other portions of appellant's letter to Johnson tended to connect appellant to the offense).

[8] With respect to appellant's letter, the State argues:

> The second piece of evidence related by the Court below was the jail letter from Appellant to the accomplice. Again that Court downplayed the jail note as a mere chastisement of the accomplice by Appellant for implicating him in the robbery. It found that the note did not link him to the robbery. As noted by the dissenting Justice below, however, the jury could have rationally believed that the contents of the letter expressed frustration and anger by Appellant that Johnson had cut a deal with the State to "snitch" on appellant, and that such treachery could lead to serious consequences for Johnson. Such a view of the letter would certainly tend to connect

A jury could also rationally find that appellant's attempt to get Johnson to sign an affidavit exonerating appellant was a suspicious circumstance. Although a rational juror could, as the court of appeals stated, find that this "could be construed as the efforts of an innocent man, currently facing serious criminal charges, to clear his name," this could also be construed by a rational juror as the efforts of a guilty man attempting to avoid responsibility for the offense by encouraging his accomplice to remain silent as to appellant's involvement in it. This, along with appellant's efforts to persuade two jail employees to falsely swear that they witnessed Johnson sign the affidavit exonerating appellant, is evidence that tends to connect appellant to the offense. And appellant declining an offer by one of these jail employees to prepare another affidavit and witness Johnson sign it in her presence is also evidence from which a rational juror could conclude tends to connect appellant to the offense.[9] *See Crumbley v. State*, 152 So. 55, 56 (Ala.Ct.App. 1933) (sufficient

---

Appellant to the crime. The majority opinion below apparently viewed this evidence as being just as consistent with innocence as with guilt. Even viewed in isolation, such a conclusion is hard to fathom.

[9]

Concerning appellant's attempts to obtain Johnson's affidavit and the jail employees' signatures on an affidavit purportedly signed by Johnson, the State argues:

The third piece/pieces of evidence was the testimony given by the jailers from the Milam County jail. Jailer Rodriguez testified that Appellant requested that Rodriguez get the accomplice to sign an affidavit prepared by appellant stating that appellant was not involved in the robbery. When Rodriguez delivered the affidavit to the accomplice, he refused to sign it and Rodriguez returned the unsigned affidavit to Appellant. Jailer Pierce was solicited by Appellant to witness an affidavit that purported to exonerate Appellant of the robbery, and was allegedly signed by the accomplice. Pierce refused because the affidavit already contained a signature purportedly executed by the accomplice. Jailer Anderson was solicited by Appellant for the same reason as Pierce, and she likewise refused to witness a document that already bore a signature. Anderson went one step further, however. She offered to prepare a whole new document and further offered to Appellant an opportunity to have both Appellant and the accomplice pulled from their jail cells so she, Anderson, could witness the accomplice sign the newly prepared affidavit. Appellant never

corroboration of accomplice testimony may be furnished by a defendant's suspicious conduct "such as conduct or declaration of accused having relation to the offense charged indicating his consciousness of guilt," and, in this particular case, the "unusual activity on the part of defendant in undertaking to reach [the accomplice in jail] and his extreme anxiety to have him silenced as a witness of the [arson by telling him to keep quiet] was of itself some evidence tending to prove a consciousness of guilt, and tended to connect defendant with the commission of the crime").

Based on the foregoing, we conclude that, when all of the non-accomplice testimony is viewed together, rather than as isolated, unrelated incidents, a rational juror could find that this evidence tends to connect appellant to the offense. *See Mitchell v. State*, 650 S.W.2d 801, 807 (Tex.Cr.App. 1983) ("combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses which tends to connect the accused with the commission of the offense supplies the test"). The evidence is, therefore, sufficient to support appellant's conviction.

The judgment of the court of appeals is reversed, and the judgment of the trial court is affirmed.

Hervey, J.

Delivered: April 29, 2009
Publish

---

accepted Anderson's offer. A majority of the Court below concluded that Appellant's creative attempts could have been construed as the efforts of an innocent man to clear his name and to bring out the truth. Again, the State contends that this view of the non-accomplice evidence by the Court below utilized a hypothetical construct that erroneously led to a finding consistent with innocence rather than guilt.