**AFFIRM; and Opinion Filed April 3, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01519-CR

### DERRICK BRYAN ALLEN, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 380th Judicial District Court
Collin County, Texas
Trial Court Cause No. 380-82591-2011**

## MEMORANDUM OPINION

Before Justices O'Neill, Myers, and Brown
Opinion by Justice Brown

Following a jury trial, Derrick Bryan Allen appeals his conviction for aggravated robbery. The evidence showed that the victim in this case, Mujeeb Rahaman, was robbed by Rodney Darden, who Rahaman had met before, and three other men who wore masks to cover their faces. One of the masked men, Darius Levi, testified at trial about appellant's participation in the crime. In his sole issue on appeal, appellant contends the evidence is legally insufficient to support his conviction because the testimony of Levi, the accomplice witness, was not sufficiently corroborated. We affirm the trial court's judgment.

Mujeeb Rahaman testified at trial that in his spare time he bought and sold things on Craigslist and Ebay. In late June or early July of 2011, Rahaman responded to an ad Rodney Darden placed on Craigslist offering about 2,000 cell phone memory cards for sale. Rahaman

called Darden, whom he had never met before, and they agreed to meet in the parking lot of a Fry's store in Plano to conduct the transaction. Rahaman paid Darden $4,000 cash in exchange for the memory cards. Rahaman then sold the memory cards on Ebay for a profit.

In early August, Darden contacted Rahaman to tell him he had about 30,000 memory cards to sell. Rahaman agreed to buy them for $22,500. They agreed to meet again in the Fry's parking lot on the afternoon of Monday, August 8th. When Rahaman arrived, Darden was waiting in his car. Rahaman approached Darden's car and asked to see the merchandise. Darden was extremely nervous and fidgety, not calm as he had been during the previous sale. He kept looking toward the Fry's store where there was a black male walking around. Darden told Rahaman the man was making him nervous. Darden said the memory cards were in his trunk and slowly got out of his car, but Rahaman had the impression Darden was trying to delay. Darden got back in his car without opening his trunk, saying he was worried because "that guy is watching." Rahaman suggested they move to a nearby gas station. Darden agreed but claimed something was wrong with his car. Rahaman drove to the gas station and waited for Darden. Darden did not show, and Rahaman eventually went home. That evening, Darden texted Rahaman and said he had been too nervous to do the deal, but wanted to try again the next day. Rahaman agreed to meet Darden at Fry's the following day.

When Rahaman arrived at Fry's on August 9th, Darden was again waiting for him in the parking lot. Rahaman asked to see the memory cards and noticed that Darden was still nervous. Rahaman opened the passenger's side door of Darden's car and leaned in. Darden said the cards were in a backpack. Darden picked up the backpack and, according to Rahaman, pretended that it would not open. At that point, Rahaman felt some movement in the background and saw a black car pulling next to him. Rahaman saw that the driver of the black car had a mask on his face, so Rahaman ran to his car. The black car had three men in it, the driver and two others who

got out. One of them came to Rahaman's car, opened the door, and tried to take his keys. He was wearing a bandana over his face and asked Rahaman to give him the money. Rahaman said he didn't have any. Rahaman's passenger's side door opened, and another male wearing a bandana over his face leaned in the car. The man on the driver's side reached into his pocket and pulled out a gun. He touched Rahaman with the gun under Rahaman's ribs and said, "I'm going to shoot you." He asked for Rahaman's wallet and cell phone, and Rahaman complied. The person on the other side of the car hit Rahaman on the head with brass knuckles. At that point, Rahaman took out a plastic bag containing the $22,500 and put it on the seat. Someone said, "Is that it?" Rahaman asked the man with the gun for his keys back. That man threw Rahaman's keys in front of the car and left. Darden was sitting in his car next to Rahaman's car the whole time. Darden left at the same time as the black car.

Rahaman testified that shortly after his wallet was stolen, his business debit card was used for three or four unauthorized transactions. Two of the transactions were with Securus Correctional Billing Services, and the other two were with Metro PCS.

Angela Perry, an employee of Securus Correctional Billing, testified that her employer handles phones in the majority of correctional institutions in the United States. Through Securus, a relative or friend of an inmate can set up an account that will allow the inmate to call them. Perry testified that on August 13, 2011, a certain Bank of America debit card number was used to open and add money to an account in the name of Jane Simpson linked to phone number (817) 298-6983. The debit card used to create this phone account was the one stolen from Rahaman. A previous Securus account in the name of Amber Whitely had been linked to the same phone number. Only one account per phone number is allowed at the same time. According to Perry, it would be possible for Jane and Amber to be the same person.

In July 2011, Matthew Barnett was working as safety and security manager for Bright Point, a company that refurbishes cell phones. Barnett testified that Bright Point collected the memory cards from the phones it refurbished and resold them. Rodney Darden and Darius Levi worked at Bright Point. Barnett learned that some cell phones or memory cards were stolen from Bright Point. Based on Barnett's investigation, it appeared that Darden and Levi were "in cahoots" and responsible for the stolen memory cards.

Detective Cathy Stamm with the Plano Police Department testified that she met with Rahaman after he reported the robbery. Based on information Rahaman provided, Stamm obtained an arrest warrant for Darden. Stamm interviewed Darden after he was arrested. Through the course of her investigation, she determined that appellant, Levi, and Fredrick Hughes were also people of interest. Stamm determined that Hughes was the driver of the black car involved.

Appellant was arrested on August 30, 2011 at the Arlington apartment of Amber Whitely. Stamm interviewed appellant after he was arrested. Appellant denied any involvement in the robbery, but did hear Darden, Levi, and Hughes talking about "hitting a lick," which is slang for committing a robbery. Appellant told Stamm that his girlfriend's name is Amber and her nickname is Lolo. He also had another girlfriend, but Stamm did not remember her name. When Stamm asked appellant about the fraudulent use of Rahaman's credit card, appellant said he had no knowledge of Amber Whitely using a credit card. Appellant seemed to suggest to Stamm that Whitely had gotten the stolen card from Hughes, with whom he had had a falling out. Even though appellant denied commission of the offense, Stamm believed he was involved because his girlfriend used the stolen credit card to pay her cell phone bill and her sister's cell phone bill and based on statements made by Levi and Darden.

–4–

Dale Dowdy, felony trial investigator with the Collin County District Attorney's Office, testified about the phone system for inmates in the Collin County Jail. Each inmate is assigned a unique pin number for making outgoing phone calls from jail. Every call is recorded. Investigator Dowdy had access to phone calls by user name and pin number. Five phone calls appellant made from jail were played for the jury.

Appellant made the first two calls on September 2, 2011, shortly after his arrest, to (817) 298-6983. Rahaman's stolen debit card had been used to set up an account for making jail phone calls to this phone number. Appellant was heard speaking to a female. She did not initially identify herself, but in the second phone call referred to herself as "Lolo." Appellant said, "They're trying to get that pistol. Did they get a pistol?" The woman replied, "No." A few minutes later, appellant said, "The dude said it was a gun involved, alright. They're trying to find that gun. . . . They can't find it alright. . . . It's another one in my bag. It's a BB gun. Get that other [inaudible] out of my bag." Appellant also said, "I'm scared . . . but I'm not scared no more . . . they ain't got nothing on me." In the second call appellant said, "As long as they don't get that weapon, then I'm good." Lolo emphatically told him, "Do not talk to nobody." She later said a detective told her the victim got hurt. Appellant said, "Yeah, he got hit in the mouth." Lolo responded, "Quit talking so much."

The other three calls were made in October 2012, right before appellant's trial, to a different female at a different phone number. Appellant had the woman look online to see if Darius Levi had been brought to Collin County to testify at his trial. Appellant said, "If he ain't here, that's very, very, very good news." When the woman said Levi was not there, appellant laughed. When the woman asked him what was going on, appellant said, "Because I don't have no witnesses. . . . They can't use Rodney. . . . I can't talk on the phone, you know what I'm saying."

Accomplice Darius Levi testified that he was indicted for Rahaman's robbery. He pleaded guilty and received a nine-year sentence. Levi and Darden had worked together at Bright Point, and Darden had stolen memory cards from Bright Point. In August 2011, Darden asked Levi to help him commit a robbery against someone Darden had previously sold memory cards to. The initial plan was for Levi to pretend to rob Darden and also rob Rahaman at Fry's. Levi didn't go through with that plan on August 8th, but they made plans to commit the robbery the following day.

On August 9th, Darden picked Levi up, and they went to an apartment in Arlington. Darden introduced Levi to appellant, and the three of them discussed how the robbery was going to go down. Fred Hughes showed up at the apartment and joined the conversation about the robbery. Eventually, Darden and Levi left for Fry's in Darden's car. Appellant and Hughes left for Fry's in Hughes's car. When they arrived at Fry's, Levi got out of Darden's car and got into Hughes's car. When the victim arrived, Hughes pulled his car next to Darden's vehicle in an attempt to block the victim in the passenger seat. When the victim ran back to his own car, Levi and appellant got out of Hughes's car. Levi hit the victim with the brass knuckles. According to Levi, appellant was the assailant who had a gun and threatened to shoot the victim. Both appellant and Levi asked for the money. Appellant took the victim's cell phone and wallet and was the last person Levi saw in possession of those items. Back at an apartment complex after the robbery, Levi saw appellant give "a white chick" some cash.

The defense introduced Metro PCS records for phone number (817) 298-6983. Those records showed that someone named Laurie Smithson was responsible for that phone account. The State recalled Investigator Dowdy, who testified that in the course of his investigation, he determined that Laurie Smithson was related to Amber Whitely and was possibly her mother.

The jury charge included instructions on the law regarding accomplice witness testimony. The jury found appellant guilty and assessed his punishment at fifteen years' confinement. This appeal followed.

Appellant contends the State failed to satisfy the accomplice witness rule. To support a conviction based on the testimony of an accomplice, there must be corroborating evidence that tends to connect the defendant with the offense. TEX. CODE CRIM. PROC. ANN. art. 38.13 (West 2005). Corroboration is not sufficient if it merely shows the offense was committed. *Id.* In making our review, we eliminate all of the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007); *Medrano v. State*, 2014 WL 284235, *11 (Tex. App.—Dallas Jan. 27, 2014, no pet.).

No precise rule can be formulated as to the amount of evidence required to corroborate accomplice witness testimony. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). In determining whether non-accomplice evidence tends to connect a defendant to the offense, the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect the accused to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). The corroborating evidence need not be sufficient by itself to establish guilt; there simply needs to be other evidence tending to connect the defendant to the offense alleged in the indictment. *Castillo*, 221 S.W.3d at 691. It may confirm a "mere detail" rather than the elements of the offense. *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). We look at the particular facts and circumstances of each case and consider the combined force of all the non-accomplice evidence

that tends to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

Here, in addition to the testimony of Levi, there was evidence that shortly after the offense appellant's girlfriend, Amber Whitely, used Rahaman's stolen debit card. Appellant contends these credit card transactions were not linked to him. Rahaman's card was used to pay Whitely's cell phone bill and to set up an account to allow inmates to call an 817 phone number linked to Whitely. While the inmate account for the 817 number was set up in the name of Jane Simpson, the previous account for that number was in Whitely's name. The jury could have reasonably concluded that a person would not use her real name to create an account with a stolen credit card. Further, appellant made calls from jail to this phone number to someone who identified herself as "Lolo," which was Whitely's nickname. And according to Investigator Dowdy, the person responsible for 817 phone account with Metro PCS was a relative of Whitely's. The jury could rationally have determined that this evidence linked appellant's girlfriend to the use of Rahaman's stolen debit card and tended to connect appellant to Rahaman's robbery.

Further, statements appellant made in phone calls from jail tended to connect him to the robbery. In the calls he made to Whitely, appellant made incriminating statements suggesting he participated in the robbery and knew something about the gun involved. He said, "They're trying to get *that* pistol," and, "They can't find it." Then he mentions *another* gun—a BB gun—in his bag. And when Whitely mentioned the victim was hurt, appellant knew that he had been hit in the head, although appellant thought Rahaman was hit in the mouth when Rahaman testified he was hit behind an ear. Appellant also made telephone inquiries with another girlfriend to find out whether Levi was in Collin County to testify against him. He was pleased to learn Levi was not in the county jail.

–8–

Appellant did make statements in these calls claiming his innocence. For example, appellant said that the State did not have any evidence against him and would not find a gun. Citing these statements, appellant suggests the phone calls have to be loosely interpreted to connect him to the offense. We disagree. A jury could have rationally found that overall appellant's statements tended to connect him to the offense. *See Simmons*, 282 S.W.3d at 509 (jury could rationally have interpreted defendant's letter to accomplice as threat rather than innocent person's expression of frustration). We conclude the corroborating evidence sufficiently connects appellant with the aggravated robbery of Rahaman. We resolve appellant's sole issue against him.

We affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

121519F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DERRICK BRYAN ALLEN, Appellant

No. 05-12-01519-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District Court, Collin County, Texas
Trial Court Cause No. 380-82591-2011.
Opinion delivered by Justice Brown.
Justices O'Neill and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 3rd day of April, 2014.

/Ada Brown/

ADA BROWN
JUSTICE