

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00071-CR

_____

JARED FORD, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1527494R

Before Gabriel, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Gabriel

## MEMORANDUM OPINION

Appellant Jared Ford appeals from his convictions for murder and aggravated robbery with a deadly weapon. *See* Tex. Penal Code Ann. §§ 19.03, 29.03. He argues that the evidence was insufficient to support his convictions and that the trial court abused its discretion by denying his motion for a mistrial. Although we affirm the trial court's judgments, we modify the aggravated-robbery judgment to reflect the correct sentence assessed by the jury and pronounced by the trial court.

## I. BACKGROUND

### A. THE OFFENSE

In the early hours of June 18, 2015, brothers Randy and Eleaquin Cardona returned to their home at the Bent Tree Apartments after playing a late-night soccer game. As they approached their apartment building, three men—all in dark clothing with their faces covered—approached the brothers and demanded their money. One of the men had a gun. Randy and Eleaquin tried to escape by running in separate directions; the armed robber followed Eleaquin, and the other two pursued Randy. After slipping and falling, Randy threw his phone at the robbers, which they took before leaving to chase Eleaquin. During the chase, Eleaquin was shot in the chest, and Randy was shot in the right shoulder. Randy found Eleaquin, pulled him to safety, and ran for help. Eleaquin was dead when police officers arrived.

## B. THE INVESTIGATION

During the resulting investigation, Detective Jerry Cedillo learned that several robberies had occurred at the Bent Tree Apartments around the time of Eleaquin's murder. The police believed that a suspect in these robberies lived at apartment 201 of the Saddlehorn Vista Apartments, which was close to the Bent Tree Apartments. Cedillo and Detective Ernie Pate surveilled the Saddlehorn Vista Apartments and saw Erik Morales leave apartment 201. Later, they saw Appellant and Charles Barnes leave the same apartment and get in a car driven by Jamal Washington.

Cedillo observed that Washington failed to use a turn signal, and he called a patrol unit to conduct a traffic stop.[1] As a result of the traffic stop, Washington and Barnes were arrested for traffic violations,[2] but Appellant was allowed to leave. During the inventory search of Washington's car, the patrol officers found Appellant's cell phone, which he had left in the car. Cedillo and Pate found a 9-millimeter ammunition clip and a loaded Glock 9-millimeter handgun equipped with a laser in the trunk of the car.

---

[1]Officers also pulled over Morales in a separate traffic stop and took him to the police station to interview him about the robbery and shooting at the Bent Tree Apartments. Cedillo was unsure whether Morales was arrested or whether Morales voluntarily agreed to go to the police station.

[2]Washington was driving without a license, and Barnes was not wearing a seatbelt in the back seat.

Cedillo and Pate then returned to apartment 201 because they "were afraid if there was any potential evidence at that location, it could possibly be destroyed" by Appellant. They spoke to Appellant's mother, Anita Hernandez, who told them that she lived in apartment 201 with Appellant;[3] she consented to a search of the apartment. Cedillo and Pate searched Appellant's bedroom and found a box containing .22-caliber ammunition and a notebook belonging to Washington. They also found a plastic bag holding more .22-caliber ammunition in a bag hanging from the closet doorknob. The ammunition had gold casings with gray tips. After removing the sheets from Appellant's bed, they found a Ruger .22-caliber semiautomatic rifle and an H & R .32-caliber revolver.

During Eleaquin's autopsy, the medical examiner recovered a bullet and bullet fragments from Eleaquin's four gunshot wounds. Five bullet casings and two bullets had been collected from the crime scene. The casings were gold, and the bullets had gray tips. A forensic analyst determined that the casings from the scene were fired from the same firearm and that the casings were consistent with casings fired from a Beretta .22-caliber firearm. The bullet recovered during Eleaquin's autopsy was a .22-caliber bullet; however, the Ruger rifle could be neither identified nor eliminated as the source of the .22-caliber bullet. The analyst was able to exclude the Ruger rifle as

---

[3]At the time, Appellant was sixteen years old. Both Morales and Washington had intermittently stayed at the apartment as well.

4

the firearm that had fired the five casings found at the murder scene. Cedillo concluded that he had not found the murder weapon.

Mark Sedwick, a special agent with the Federal Bureau of Investigation, analyzed Appellant's cell-phone records. Both the Bent Tree Apartments and the Saddlehorn Vista Apartments were located in an area where the service of two cell towers overlapped. As a result, Sedwick could not determine if Appellant's phone was moving between the crime scene and Appellant's apartment at the time of Eleaquin's murder. But Sedwick did determine that Appellant's phone was located in the overlapping service area at the time of the murder. Appellant's phone records also revealed that during the time of Eleaquin's murder, his "phone [went] blank." Shortly after Eleaquin's murder, "the phone activity pick[ed] up again," and there was an electronic communication about selling a Beretta .22-caliber firearm. The data card from Randy's cell phone later was found in Washington's phone.

Cedillo procured arrest warrants for Appellant, Washington, and Morales in 2016. When Washington was arrested, he stated that he lived at apartment 201 of the Saddlehorn Vista Apartments. When Morales was arrested, officers also arrested Skylynn Perez, Morales's girlfriend and the mother of his two children, for hindering prosecution.[4]

---

[4]Perez lied to the arresting officers and initially told them that Morales was not in her apartment. The officers found Morales hiding in a cabinet.

## C. TRIAL

Morales testified against Appellant under a conditional plea agreement with the State for a twenty-year sentencing recommendation in exchange for his truthful testimony. Morales testified that he, Washington, Appellant, and Duane Thomas decided to rob someone for "easy money." They all dressed in black clothing and covered their faces. Morales and Washington carried loaded revolvers; Appellant carried a loaded Beretta .22-caliber firearm. Both Appellant and Morales loaded their firearms while holding a cloth so their fingerprints would not be found on the ammunition. After jumping a fence to get to the Bent Tree Apartments, they saw two Hispanic men walking in the parking lot. Washington and Thomas chased one of the men, and Appellant pursued the other. At some point, Morales heard gunshots and saw that Appellant had "started running back towards [Morales] shooting his gun." When the men returned to apartment 201, Appellant told Morales that when one of the Hispanic men had tried to take his firearm, Appellant had killed him.

Senneca Rockmore was Appellant's neighbor at the Saddlehorn Vista Apartments. He was at Appellant's apartment with Appellant, Morales, Washington, and Thomas on June 18, playing video games and smoking marijuana. Rockmore heard them discussing robbing someone for "easy money" and knew that multiple firearms were kept in apartment 201. Rockmore did not leave apartment 201 with

Appellant, Morales, and Thomas.[5]  When they returned, they had a cell phone, and Appellant was upset because "something . . . had happened," possibly "something bad."

Perez also testified at Appellant's trial.  She stated that after Morales was questioned and released by the police, she, Morales, and Appellant travelled to Florida.  During the car ride while a song entitled "Homicide" played, Appellant "was basically singing to [Morales] that he killed somebody like pridefully."  The trio stayed in Florida for approximately ten days, and Appellant told Perez during that time that he had "killed somebody."

Michael Bell lived in apartment 102 of the Saddlehorn Vista Apartments and owned a Beretta .22-caliber firearm and difficult-to-find, .22-caliber ammunition with lead tips.  He testified that his Beretta had been missing since May 2015 and that the fence directly behind his first-floor apartment was in disrepair.[6]  Bell testified that there was a high number of young African-American and Hispanic men living in apartment 201, which was "catty-corner from [Bell's] apartment and upstairs."  The State introduced into evidence pictures taken in May 2015 of Appellant holding a Beretta .22-caliber firearm, which Bell testified looked very similar to his Beretta

---

[5]Rockmore testified that Washington stayed with him.

[6]Bell's Beretta and ammunition were stolen from his apartment in April 2015, but this evidence was not admitted until punishment.

because of the grip. The ammunition found in Appellant's bedroom was "exactly the same" as the ammunition Bell had bought online.

The jury found Appellant not guilty of capital murder, guilty of murder, and guilty of aggravated robbery with a deadly weapon. At the punishment trial, the State produced evidence that Appellant was connected to a string of robberies at the Bent Tree Apartments and at other nearby apartment complexes, which had occurred both before and after Eleaquin's murder and before Appellant was arrested. The robberies were factually similar: the victims were Hispanic and were often accosted in the complexes' parking lots. Several items that had been stolen in these robberies were found in Appellant's bedroom.

When the State rested its punishment case, Appellant moved for a mistrial and argued that the State had failed to prove the extraneous offenses beyond a reasonable doubt. The trial court denied the mistrial motion but included a jury instruction in its charge, informing the jury that it could consider extraneous-offense or bad-act evidence only if the State had proven beyond a reasonable doubt that Appellant could be held criminally responsible for them. The jury assessed Appellant's punishment at twenty-five years' confinement for murder and at ten years' confinement for aggravated robbery.

## II. SUFFICIENCY OF THE EVIDENCE: MURDER

In his first issue, Appellant argues that the evidence was insufficient to support his murder conviction because Morales's accomplice testimony was insufficiently corroborated. The State concedes that Morales was an accomplice as a matter of law.

The code of criminal procedure prohibits a conviction based solely on an accomplice witness's testimony unless the testimony is "corroborated by other evidence tending to connect the defendant with the offense committed." Tex. Code Crim. Proc. Ann. art. 38.14. Corroboration of accomplice testimony is not sufficient if such corroborating evidence shows nothing more than the commission of the offense. *Id.*

When evaluating the sufficiency of non-accomplice, corroborating evidence, we "eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). The corroborating evidence need not prove the accused's guilt beyond a reasonable doubt nor does it have to directly link the accused to the commission of the offense. *Casanova v. State*, 383 S.W.3d 530, 538 (Tex. Crim. App. 2012). Rather, the non-accomplice evidence need only link the accused in some way to the crime, allowing a rational fact-finder to conclude that the non-accomplice evidence sufficiently tended to connect the accused to the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

There is no threshold amount of non-accomplice corroboration evidence required for sufficiency purposes; courts must judge each case on its own facts. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). Even apparently insignificant circumstances may provide sufficient evidence of corroboration. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999); *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999). Although a defendant's mere presence at the crime scene alone is insufficient corroborative evidence, "[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984), *quoted in Smith*, 332 S.W.3d at 443.

By eliminating Morales's testimony, we conclude that the remaining evidence tended to connect Appellant to Eleaquin's murder such that Morales's testimony was sufficiently corroborated. Appellant was known to have multiple firearms, including a Beretta .22-caliber firearm, which could have fired the bullets and casings found at the crime scene. The night of the murder, Appellant's cell phone was in the area where Eleaquin was murdered but was "dark" at the time of the murder. Shortly after the murder, Appellant's cell phone became active and messages about selling a Beretta .22-caliber firearm were sent. Rockmore heard Appellant planning to rob someone for "easy money" the night of Eleaquin's murder, and when Appellant returned later that night, Rockmore noted that Appellant and the others were upset because

10

something "bad" had happened. After Morales was interviewed by police officers about Eleaquin's murder, Morales and Appellant fled to Florida. On that trip, Appellant confessed to Morales's girlfriend that he had killed someone. This and other non-accomplice evidence previously discussed, along with the reasonable inferences to be drawn from it, tended to connect Appellant to Eleaquin's murder and thus was sufficient to corroborate Morales's testimony. *See, e.g.*, *Smith*, 332 S.W.3d at 447; *Simmons v. State*, 282 S.W.3d 504, 509–11 (Tex. Crim. App. 2009); *McDuff v. State*, 939 S.W.2d 607, 612–13 (Tex. Crim. App. 1997). Therefore, we overrule Appellant's first issue.

## III. DENIAL OF MISTRIAL AT PUNISHMENT

In his second issue, Appellant argues that because the State did not prove the extraneous robberies beyond a reasonable doubt at punishment, the trial court abused its discretion by denying his motion for mistrial. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1). Appellant points to the facts that none of the robbery victims could identify Appellant as the robber; that some of the stolen items were found in a bedroom that Morales, Washington, and Rockmore had access to; and that some of the stolen items were not in Appellant's possession when they were found. We review a trial court's denial of a mistrial for an abuse of discretion. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).

Here, Appellant did not object to the admissibility of the extraneous-offense evidence but waited until the State closed its case on punishment to move for a

11

mistrial. *Cf. Hardeman v. State*, No. 02-10-00025-CR, 2011 WL 1901978, at *3 (Tex. App.—Fort Worth May 19, 2011, no pet.) (mem. op., not designated for publication) (recognizing admissibility of extraneous offenses at punishment is threshold determination for trial court); *Abbott v. State*, 196 S.W.3d 334, 347 (Tex. App.—Waco 2006, pet. ref'd) (same). Because the evidence was admitted with no objection, whether the State connected Appellant to the extraneous offenses beyond a reasonable doubt was a fact question for the jury. *See Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996) (plurality op.); *Nanez v. State*, 179 S.W.3d 149, 151–52 (Tex. App.—Amarillo 2005, no pet.). Indeed, the trial court sua sponte instructed the jury as such, and Appellant points to no evidence that the jury disregarded the instruction. We cannot conclude that the trial court's admission of the extraneous offenses and sua sponte submission of the issue to the jury as a question of fact, neither of which was objected to, were so extreme or incurable that the trial court's denial of a mistrial constituted an abuse of discretion. *See Durant v. State*, No. 08-11-00168-CR, 2013 WL 2922267, at *3–4 (Tex. App.—El Paso June 12, 2013, no pet.) (not designated for publication); *Musgrove v. State*, No. 02-08-029-CR, 2008 WL 5265200, at *5 (Tex. App.—Fort Worth Dec. 18, 2008, pet. ref'd) (mem. op., not designated for publication). *See generally Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004) (explaining mistrial is appropriate remedy only in extreme cases, i.e., when highly prejudicial and incurable errors occur, which is determined based on

analysis similar to harm analysis under rule 44.2(b)). We overrule Appellant's second issue.

## IV. AGGRAVATED-ROBBERY JUDGMENT

The State points out in its brief that the aggravated-robbery judgment reflects that Appellant's imposed punishment was twenty-five years' confinement but that the jury assessed his punishment at ten years' confinement. Indeed, the trial court orally pronounced a sentence of ten years' confinement for aggravated robbery, which controls over the written judgment. *See Taylor v. State*, 131 S.W.3d 497, 502 (Tex. Crim. App. 2004). We therefore modify the trial court's aggravated-robbery judgment to reflect a sentence of ten years' confinement.

## V. CONCLUSION

Having overruled Appellant's two issues, we affirm the trial court's murder judgment. *See* Tex. R. App. P. 43.2(a). We modify the trial court's aggravated-robbery judgment to reflect a sentence of ten years' confinement and affirm it as modified. *See* Tex. R. App. P. 43.2(b).

/s/ Lee Gabriel

Lee Gabriel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: April 4, 2019

13