**Affirmed and Memorandum Opinion filed October 19, 2023.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-22-00041-CR

**JOSE YBARRA LEYVA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 17-CR-1875**

## MEMORANDUM OPINION

On May 23, 2017, Santos Botello and brothers Jaime and Ricardo Posada drove to the decedent's house intending to commit an assault. The Posada brothers took plea bargains in exchange for their testimony against appellant. According to their accomplice-witness testimony, appellant was not present during the murder, but he orchestrated the attack and told Botello to shoot the decedent.

A jury found appellant guilty of murder and assessed punishment at thirty-three years' confinement. In two issues, appellant contends that the trial court

erroneously admitted evidence and that the evidence is insufficient to satisfy the corroboration requirement of the accomplice–witness statute. We affirm.

## I. ACCOMPLICE–WITNESS CORROBORATION

In his second issue,[1] appellant contends that the evidence is insufficient to satisfy the corroboration requirement of the accomplice–witness statute, Article 38.14 of the Code of Criminal Procedure.

### A. Legal Principles and Standard of Review

A conviction obtained in reliance upon accomplice testimony must be supported by sufficient corroborating evidence tending to connect the defendant with the offense committed. Tex. Code Crim. Proc. art. 38.14; *Simmons v. State*, 282 S.W.3d 504, 505 (Tex. Crim. App. 2009). To determine whether non-accomplice evidence tends to connect a defendant to the offense, "the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Simmons*, 282 S.W.3d at 508 (quoting *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008)).

The corroborating evidence itself need not prove the defendant's guilt beyond a reasonable doubt. *State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016). Nor does the corroboration requirement apply separately to each element of the offense charged or to each aspect of the accomplice's testimony. *Id.*

---

[1] We first address appellant's second issue because it would entitle him to rendition of a judgment of acquittal. *See Price v. State*, 502 S.W.3d 278, 281 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (addressing rendition point first); *see also Cathey v. State*, 992 S.W.2d 460, 463 n.2 (Tex. Crim. App. 1999) ("[T]he State's failure to sufficiently corroborate accomplice testimony in accordance with the statute results in the remedy of acquittal." (citing Tex. Code Crim. Proc. art. 38.17)).

There need only be some evidence tending to connect the defendant to the crime. *Id.*

To determine if the non-accomplice evidence tends to connect the defendant with the offense, we eliminate the accomplice testimony from consideration and consider only the non-accomplice evidence. *See Malone*, 253 S.W.3d at 257. We must consider the combined force of all the non-accomplice evidence. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). When there are two permissible views of the evidence—one that tends to connect the accused to the offense and one that does not—we must defer to the jury's resolution. *Id.* (citing *Simmons*, 282 S.W.3d at 508).

## B.    Non-Accomplice Evidence

### 1. Relationship with the Decedent's Son

The decedent was the father of a son who was a senior in high school. The son had seen appellant around the school because appellant's nephew attended the same school. About a month before the decedent was shot and killed, the son's aunt introduced him to appellant. Appellant offered to help the son with school, "economically speaking." The son thought this was weird. After that day, for about a week while the son was working at a restaurant, appellant would eat at the restaurant and tip the son $100 each day. Appellant took the son shopping for a graduation ring.

On May 6, 2017, the son was working at the restaurant when appellant came in and sat at a booth. While the son was talking with appellant, another man grabbed the son and started stabbing him. The son fell to the floor. Appellant remained seated. The assailant, later identified as Santos Botello, fired a pistol toward the ceiling as he fled the restaurant. The son recognized Botello as

3

someone who had been sitting in the restaurant with appellant on the day before the stabbing. Although the police took a statement from appellant, he provided no useful information.

Soon after the stabbing, appellant spoke with the son's parents; appellant said he wanted to help the son and to protect the son because there was "something bad" inside the son and "that's why what happened in the restaurant happened." During another visit with the son and his aunt, appellant recited Catholic prayers for the son's protection. Appellant rubbed oil on the son's stab wounds.

A few days later, the son went to appellant's home alone. Appellant claimed that Saint Cipriano spoke through appellant; the son described it like appellant was sleeping and the saint would come through appellant. Appellant told the son that there was something bad inside the son like an evil spirit, and the son was cursed by witchcraft. Appellant said the evil was located in the son's private area, and appellant needed to touch the son's privates to cure the evil. Appellant touched the son's private area.

During another visit, appellant spoke as the saint and told the son that for him to be cured from the evil, a man would need to perform oral sex on the son. This information "didn't sit too well" with the son. After that meeting, the son told his parents what the saint was asking the son to do.

Appellant contacted the son and asked if the son had found someone or thought of someone to perform oral sex on him. The son testified that appellant was "alluding to that he wanted to be the one to do it." Appellant "continued insisting that he would do it. He wanted to do it." The son told his family that he no longer wanted to see or speak with appellant, and the son's family was supportive. Appellant kept calling the son and would come to the son's house

4

looking for him, sometimes three times per day. Appellant came to the son's house to look for him on the day before the murder.

## 2. The Murder

The decedent's adult niece and her family lived on the same property with the son and his family. While the son was in school on the day of the murder, May 23, the niece was at home. She testified that she saw a truck park at the property, leave, and drive by several times. She thought the truck was suspicious. Prompted by the niece's observation, the decedent went to a gate near the entrance to the property and closed it. While the niece and decedent were speaking on the phone, the niece again saw the black truck pull up and park at the gate. The decedent said he would stop by the property. The niece then saw a person carrying something— she thought it was a stick or bat—walking up the driveway.[2]

When the decedent arrived, the man on the property hid near another vehicle that was on the property. The decedent approached the passenger side of the vehicle. The passenger window lowered. The niece heard gunshots, and the decedent fell. After calling 911 at about 10:37 a.m., the niece found the decedent face down in a ditch, covered in blood.

A tow truck driver witnessed the murder. He testified that he saw the black truck—a Ford F150 King Ranch edition—parked on the side of the road. When the tow truck driver slowed down to pass the F150, he saw a gun come out of the passenger side window. He saw more than three muzzle flashes.

When the F150 sped away, the truck driver followed it. He took a picture of the F150, which included the license plate, and he called the police. He saw two male Hispanics in the F150.

---

[2] Police officers later found the item, a rifle, on the property.

### 3. *The Truck and Identification*

A detective testified that the F150 was registered to the two accomplices, brothers Jaime Posada and Ricardo Posada. The license plate on the F150, however, did not belong to the F150. Police officers searched Botello's property and found a different black Ford truck missing its license plates. The license plates associated with the VIN for that truck were the plates found on the F150. Officers found writing on a door of a shed that referred to Saint Cipriano, among other religious and pagan items. Botello attempted to flee but was arrested.

### 4. *The Phone Records*

Police officers obtained data for phone numbers associated with the son, appellant, Botello, and Ricardo Posada, including when calls were made and their approximate locations based on the coverage areas of cell phone towers. A Federal Bureau of Investigation agent testified about the data.

Between May 5 and May 25, appellant and Botello exchanged 92 phone calls. Between May 18 and May 23, appellant and Posada exchanged 32 phone calls.

On the day of the son's stabbing, May 6, Botello's phone was at his property while appellant's phone was at the restaurant. Botello made several calls to appellant, and appellant called Botello. Then, Botello's phone moved to the area of the restaurant. Botello called appellant while both phones used the same tower near the restaurant. Forty-five minutes later, Botello's phone moved to the coverage area that included his residence.

On the day before the murder, May 22, appellant called the son seven times. Botello and Posada also exchanged multiple calls. The agent testified that the cell

phone activity was consistent with Posada spending the night at Botello's residence.

On May 23, Botello and appellant exchanged multiple phone calls shorty before and after the murder. Beginning at 10:32 a.m., a phone call between Botello and appellant lasted about six minutes. Botello's phone used the tower covering the crime scene. A few minutes later, Botello's and Posada's phones used the tower covering Botello's residence.

### 5. *Appellant's Statements*

Appellant was interviewed by the police; it was recorded and admitted as an exhibit. He made multiple contradictory and inculpatory statements, such as:

- Appellant repeatedly denied owning a cell phone. He later admitted to owning a cell phone.

- Appellant denied putting oil on the son. Then he admitted to putting oil on the son's upper body. He denied putting oil on the son's penis. Then he admitted to putting oil on the son's "nuts."

- Appellant said he had only met the Posada brothers one time, two and a half months prior. Then he admitted to seeing and talking with the brothers at Botello's house on the Saturday before the murder.

- Appellant denied knowing anything about the incident except for what he saw on the news. He denied being involved. Then he admitted to telling Botello that he wanted the men to beat someone up—"whoever was there." The men were supposed to "beat up a person and to get the hell out of there."

Appellant also made statements that conflicted with the phone records. For example, he said he talked to Botello only about twenty times since the stabbing incident and did not talk to Botello on the day of the murder.

7

## C.  Analysis

Appellant contends that the evidence is insufficient under Article 38.14 to connect him to the murder because there was no evidence that appellant "marked" the decedent for murder or ordered Botello to shoot the decedent.  However, the evidence required for corroboration need only tend to connect appellant to the murder—the evidence need not establish appellant's commission of each element under the law of parties.  *See Ambrose*, 487 S.W.3d at 598.

The non-accomplice evidence shows that appellant had a motive to harm the son's family for supporting the son's rebuke of appellant's sexual advance.  *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Motive is a significant circumstance indicating guilt.").  Appellant admitted to meeting with Botello and the two accomplice witnesses and telling the men to assault someone.  Then, appellant communicated frequently with the men before, during, and after the murder.  *See Longoria v. State*, 154 S.W.3d 747, 758 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (reasoning that the primary evidence corroborating the accomplice testimony was cell phone records showing communications and attempted communications between the defendant, the accomplice witness, and another accomplice during and after the offense); *cf. McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) ("Evidence that the defendant was in the company of the accomplice at or near the time or place of the offense is proper corroborating evidence.").  He also lied to the police, showing a consciousness of guilt.  *See Guevara*, 152 S.W.3d at 50 (inconsistent statements to police and lies about the defendant's relationship with an accomplice are probative of guilt).  Finally, the jury could have rationally inferred that appellant orchestrated the son's stabbing based on his presence with Botello at the restaurant and communications

with Botello on the day of the stabbing, and thus, appellant was aware of Botello's capacity for violence.

Considering the combined force of the non-accomplice evidence, rational jurors could have concluded that the evidence sufficiently tended to connect appellant to the offense.

Appellant's second issue is overruled.

## II.    EXTRANEOUS–OFFENSE EVIDENCE

In his first issue, appellant contends that the trial court erred by admitting evidence of an extraneous offense—the stabbing incident—under Rule 403 of the Texas Rules of Evidence.  The State contends that appellant did not preserve error.  Appellant does not address error preservation.  We agree with the State.

As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling sought from the trial court with sufficient specificity to make the trial court aware of the complaint.  *See* Tex. R. App. P. 33.1; *see also* Tex. R. Evid. 103(a)(1).  To preserve error regarding the admission of evidence, a party must object each time the inadmissible evidence is offered, obtain a running objection, or request a hearing outside the presence of the jury.  *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *see also* Tex. R. Evid. 103(b).

Appellant did not object to evidence of the stabbing incident based on Rule 403.  Thus, he did not preserve any error.

Appellant's first issue is overruled.

### III.  CONCLUSION

Having overruled appellant's issues, we affirm the trial court's judgment.



/s/     Ken Wise
Justice


Panel consists of Justices Wise, Zimmerer, and Wilson.

Do Not Publish — Tex. R. App. P. 47.2(b)