**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00203-CR**
_____

**MARTIN VINCENT PETTWAY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 19-33171**

**MEMORANDUM OPINION**

Appellant Martin Vincent Pettway[1] challenges his conviction for murder. *See* Tex. Penal Code Ann. § 19.02. In his sole issue, Pettway complains there is insufficient evidence to support his conviction and to corroborate the accomplice witness testimony. We affirm the trial court's judgment.

---

[1] The record reflects that Martin Vincent Pettway is also known as Martin Vincent Pettway Jr.

1

## Background

A grand jury indicted Pettway for murder, alleging he "intentionally and knowingly cause[d] the death of an individual, namely: JESSE ANGEL RODRIGUEZ, hereafter styled the Complainant, by shooting Complainant with a deadly weapon, to-wit: a firearm[.]" Prior to the shooting, Jesse was with his friends and family eating at a pizza restaurant, and Pettway and his three friends were at the same restaurant.

**Marsha**[2]

Marsha testified that on the day of the shooting, she was at the restaurant with Jesse, her boyfriend Dennis, and a few other friends. She said there was a group of four African Americans, two males and two females, walking out of the restaurant when Jesse pushed his chair back to leave and "bumped into a man." Marsha did not remember if Jesse and the man, whom she described as a "tall light-skinned man[,]" exchanged words, but she could tell the man was "upset." She testified that Jesse left after the group of African Americans, while she and her friends stayed inside. She observed Jesse exchange words with the group outside but did not remember if it became physical. During cross-examination, Marsha testified that she observed one

---

[2] We use pseudonyms to conceal the witnesses' identity. *See* Tex. Const. art. 1, § 30(a)(1) (granting the victim of a crime "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

of the girls holding back the "light-skinned male" from fighting Jesse in the parking lot. Marsha explained that when she got into Dennis's truck to leave, she noticed the group of African Americans following them in a car. Marsha stated that Jesse was driving his truck, and their friend Ethan was his passenger. Both Jesse and Dennis exited the parking lot and turned into the middle lane of the three-lane service road and stopped at a stoplight. Marsha testified that she and Dennis were several cars behind Jesse when she observed the African Americans drive past in the right lane, and she did not know which African American was driving. When the stoplight turned green, Marsha saw Jesse turn left and go under an overpass, and she heard "a gunshot[.]" When she got to Jesse, he was "bleeding out from the left side of his head."

Marsha called 911, and a copy of the 911 audio recording was admitted at trial. On the call, Marsha described the African Americans' vehicle as a black car with a rear bumper missing. Marsha testified that she did not see anyone in the black car with a gun, but she assumed the gunshots came from that car because "they were having an argument." At trial, Marsha identified Pettway as a dark-skinned male, and she explained that he was part of the group at the restaurant and he was in the black vehicle. She could not remember if she observed Pettway arguing with Jesse before the shooting.

3

**Dennis**

Dennis, Marsha's boyfriend, testified he was at the restaurant with Jesse the day of the shooting. He stated that their group was seated by the main exit. He recalled that when Jesse stood up to leave, he bumped someone exiting the restaurant. The person Jesse bumped said, "'Watch out' or something." Dennis testified that the group exiting included two males, one dark skinned and one light skinned, and two females, and after the person said "[w]atch out" the group exited and then Jesse left. Dennis observed Jesse exchanging words with the group in the parking lot, and when he saw one of the females "holding back the dark male[,]" he and his friends went to "see what was going on." He denied going to fight anyone in the parking lot, or that Jesse planned to fight anyone.

Dennis explained that he was with Marsha in his truck and that Jesse and Ethan were in Jesse's truck, and when they entered the middle lane of the three-lane feeder road, Dennis noticed a black car with a missing bumper following them. He testified that the light-skinned male was driving the black car and the dark-skinned male was in the passenger seat. According to Dennis, the group in the black car was "staring at us but we just -- we were just like, 'That's the people from [the pizza restaurant].' We didn't want no problems with them." When the stop light turned green, Dennis observed Jesse turn left and heard "three loud noises."

The jury viewed surveillance video from the restaurant, and Dennis identified his group of friends and Jesse on the video. Dennis explained the video showed Jesse bumping the dark-skinned male with his chair, and he identified the dark-skinned male as Pettway, although during cross-examination, he said the chair did not actually bump Pettway. Dennis also stated that outside the restaurant, the light-skinned and dark-skinned males exchanged words with Jesse.

**Donald**

Donald, Jesse's older brother, was also at the restaurant. He recalled eating pizza and said that when the meal ended, Jesse and a group of two males and two females were leaving the restaurant at the same time. He testified that Jesse bumped the "light-skinned" male, who said, "'Watch yourself.'" Donald stated the dark-skinned male was "basically walking with him." Donald explained that Jesse walked out behind the group, and he saw an interaction between Jesse and the group outside. He did not think Jesse went outside to "pick a fight[.]" According to Donald, the interaction was over when he got outside, and he left with his other brother and Jesse left with a friend.

Donald testified that when they left, they entered the middle lane of the three-lane feeder road and stopped at a stoplight. Donald testified that he was behind Jesse's truck when he observed the group from the restaurant pass him in a black Ford Fusion, roll down their windows, put on a mask, and drive next to Jesse's

5

vehicle. Donald testified the light-skinned male was driving the car, but he did not see the dark-skinned male. Donald explained that when the stoplight turned green, Jesse turned left, the black car turned right, and he heard at least four gunshots. He did not see who fired the gunshots.

**Jimmy**

Jimmy, Jesse's younger brother, testified that when Jesse was leaving the restaurant, "[I] guess since [Jesse] was facing like not towards the exit, I guess he didn't see that they were coming through, so, the chair, it probably hit them." According to Jimmy, there were two males in the group, and the dark-skinned male, who he identified as Pettway, said, "Watch yourself." When the group and Jesse went outside, Jimmy observed both males "exchanging words" with Jesse. The exchange was over when Jimmy got outside, so he got into his car with Donald and another friend, and he saw the group circling the parking lot. Jimmy explained that Jesse was stopped in the middle lane of the three-lane feeder road preparing to turn left, when the group passed Jesse on the right with their back window rolled down. Jimmy did not see who was in the backseat. Jimmy testified the light-skinned male was driving and "they were like covering their face[,]" and as they were all turning left, he heard five gunshots. Jimmy testified that his friend in his vehicle yelled "Hey, they're shooting[,]" and a bullet hit his passenger door. During cross-examination, Jimmy testified that the light-skinned male was more animated with Jesse during the

6

exchange in the parking lot, while the dark-skinned male was "looking back and walking[.]" He also contradicted his police statement, in which he reported that the driver of the black car was the man Jesse bumped into and the shooter. Jimmy denied seeing a gun.

**Ethan**

Ethan testified that when Jesse got up to leave the restaurant, a man, who he identified as Pettway told Jesse to "Watch yourself[,]" and walked out. Ethan testified Pettway was with a light-skinned male and two females. While watching the surveillance video in court, Ethan explained he saw the two men confront Jesse in the parking lot but did not hear what they said. Ethan testified everyone in their group was "calm" and left in a "peaceful kind of way." Ethan was in the front passenger seat of Jesse's truck when he observed the group pull behind them in the parking lot in a black car, and the driver had his window down and gave them a "look[.]" He described the driver as the "light-skinned guy[,]" and he did not see where the dark-skinned guy was sitting. Ethan testified that they were on the feeder road sitting at a stoplight, when he noticed the black car was next to them, and both windows on the driver's side were rolled down. Ethan saw the driver put on a mask and that there was someone in the back seat. Ethan then testified as follows:

> Well, as soon as we started to drive off to -- you know, to actually get under the underpass, I see that the car just goes faster and stops like, you know, like as if he was going to turn right but he kind of stops. And I just told Jesse go straight instead of going left and from there I just

7

heard like a loud noise and I thought it was his tire that blew. I mean, it happened often, you know. So, I told him "Hey, bro," I was, like, "Hey, your tire," and when I look at him, I was like -- I was like -- he was like not responding to what I was telling him. And that's whenever he lets go of the wheel and starts falling towards me.

After hearing four shots, he knew that "Yeah. We're getting shot at[.]" Ethan did not see the gun or the shooter.

**Nyah Mayfield**

Mayfield, who was dating Pettway, testified that on the day of the shooting she was at the restaurant with Pettway, Xavier Parrish, and Xavier's girlfriend, Taylor Jones. She described Parrish and Pettway as best friends. Mayfield testified that they drove to the restaurant in Parrish's black four-door car. Mayfield denied that words were exchanged with Jesse inside the restaurant, but when they were outside, Parrish was trying to be a bully when he asked Jesse and his friend, "Hey, bro, y'all good?" Mayfield explained the exchange did not escalate, and the parties got into their vehicles. She testified Parrish was driving, she was in the rear passenger's side seat, Jones was in the front passenger's side seat, and Pettway was in the rear driver's side seat. Mayfield testified that when they got in the car, Parrish "wasn't finished, you know, just being a bully[,] and he "kind of circled the parking lot[.]" She described Parrish as trying to "get their attention[,]" but Jesse and his friends were not "retaliating[.]" Mayfield explained that when they left the parking

8

lot, Jesse entered the middle lane of the three-lane feeder road, and Parrish turned into the right lane.

Mayfield testified that when they pulled up next to Jesse's vehicle, Parrish had his windows down, was playing loud music, and grabbed a towel and put it over his head. Parrish twice told Pettway, "Do it, brother[.]" When the light changed, Mayfield saw Pettway lean out the window and look back, and she heard "six or seven" gunshots. Mayfield stated that she started "going off[,]" but stopped when she "realized that, well, if they're capable of doing something like that, maybe I should calm down." Mayfield testified that she believes Pettway fired the gunshots. She also acknowledged that although she talked to the police, she was under indictment for Jesse's murder. Mayfield denied that the prosecutor or police promised her anything in exchange for her testimony, and she claimed her testimony was truthful. During cross-examination, Mayfield testified she did not see Pettway or Parrish with a gun and that Parrish could have fired the gunshots, but she did not know who the shooter was.

**Taylor Jones**

Taylor Jones testified that she and Parrish were in a relationship the day of the shooting. Jones testified that when she went to the restaurant with Parrish, Pettway, and Mayfield, she noticed that Pettway had a gun on his hip. According to Jones, as they were preparing to leave, "someone…bumped [Pettway]." Jones explained the

9

man was part of a large group of people sitting in the front of the restaurant. She testified that she did not see the "bump[,]" but Pettway said it happened and he was "very upset." She described the exchange in the parking lot, stating Parrish exchanged words, but it "wasn't nonfriendly[,] [and] didn't pose a threat." Jones testified that there was no confrontation before they got into Parrish's car, and she explained that Parrish was driving, she was in the front passenger seat, Mayfield was in the rear passenger seat, and Pettway was in the rear driver's side seat. Jones testified that after they entered the right lane of the three-lane feeder road, they stopped at a light beside Jesse's vehicle, which was in the middle lane. Jones explained that when the light turned green, Parrish turned right, and she heard "four or five" gunshots. Jones testified she saw Pettway holding a black handgun. She recalled that Pettway had a "smirk" on his face and said, "that he didn't give a fuck and that if I said something, he'd kill me, too." Jones testified that she believes Pettway fired the gunshots "[b]ased on his demeanor, the gun being in his hand and his response to me when I told him he was going to have to answer for that." Jones did not go to the police that day because she was "scared for my life." Jones explained she talked to the police two days later, and she confirmed she was under indictment for Jesse's murder.

On cross-examination, Jones admitted that in her police statement she said she did not see a gun but thought that she saw a gun. She reiterated that on the day of the

shooting, she saw a black gun when she turned around in Parrish's car to look at Pettway. She confirmed that Parrish and Jesse exchanged words in the parking lot and that she had to grab Parrish and tell him to go to the car. She denied arguing with Parrish the day of the shooting, that Parrish circled the parking lot before entering the feeder road, and that Parrish's windows were down when he pulled alongside Jesse's vehicle.

**Brandon Rodriguez**

Brandon Rodriguez, a police officer with the City of Beaumont, testified that he was working "off duty" on the day of the shooting when he received a call about "shots fired" and that someone had been shot in the head on a nearby road. Rodriguez stated that he and another officer were the first law enforcement on the scene that day.[3] He described the scene as "[c]haotic[,]" with several vehicles and people in the intersection, lots of voices and "moving parts all at the same time." He found Jesse sitting in the driver's seat of a truck in the intersection. He recalled that the back window of Jesse's truck was shattered and that there was a small bullet hole through the driver side headrest.

---

[3] James Blanchard was on off-duty patrol with Rodriguez and testified as to his role that day. He confirmed that he and Rodriguez were the first officers on the scene. He stated that due to his EMT background, his main concern and role was to medically treat Jesse, and he rode to the hospital with the medics.

**Dorian Pantallion**

Dorian Pantallion, a police officer with the Beaumont Police Department, stated that when he responded to a call regarding a shooting at an intersection, he located four to five shell casings on the ground. He testified that the shell casings were found five to ten feet apart and were consistent with shells being fired out of a moving vehicle turning right on the feeder road. He also testified they were consistent with the shots fired at Jesse's vehicle. Video footage from his body camera was admitted into evidence. On cross-examination, Pantallion testified he did not know how the spent shell casings came to be in the street but noted the shell casings looked "fresh[.]"

**Michelle Ceja**

Michelle Ceja testified that she is a crime scene technician for the Beaumont Police Department. She testified that during her investigation of the crime scene, she spoke to officers, marked the scene, took video, and collected shell casings. Video and photographs of the shell casings were admitted at trial. Ceja described the location where she found the shell casings. She noted that some of the shell casings had been run over by vehicles. Ceja testified that the shell casings were processed for fingerprints, but none were recovered, which was not uncommon. She agreed on

cross-examination that the location of the shell casings did not demonstrate where they originated.[4]

**Dr. Ray Fernandez**

Dr. Ray Fernandez testified he performed Jesse's autopsy and recovered a bullet from Jesse' s head. He identified Jesse's death as a homicide. Photographs of Jesse's autopsy were admitted at trial.

**Hunter Jones**

Hunter Jones, a forensic investigator and firearm examiner for the Jefferson County Crime Lab. As a firearm examiner, he explained his examination procedures and testified that he uses his education to examine casing and bullets to determine whether there is "a common source of origin" or if "they all go back to a singular source or [if] multiple firearms could be responsible." Jones testified he examined the bullet casings collected from the scene, and he explained that they were all the same brand .45 caliber, including the bullet collected from Jesse's autopsy. Jones explained his process of determining the origin of the bullet casings without a firearm to compare and opined that the bullet casings were all fired from the same unknown firearm.

---

[4] Lyndsie Breaux, a crime scene technician with the Beaumont Police Department, testified she attended Jesse's autopsy and collected the bullet removed from his head for evidence. The bullet was admitted into evidence.

**Tomora Hamilton**

Tomora Hamilton, a detective with the Beaumont Police Department, testified she was the lead investigator in Jesse's murder. Hamilton explained she reviewed surveillance footage from the restaurant and witness statements, and after the surveillance footage was released to the media, tips came in through crime stoppers. At trial, Hamilton identified the various people on the surveillance footage including Jesse and Pettway, and she identified Pettway in court. Hamilton testified that the footage showed a group of four people, including Pettway, a "darker-skinned male[,]" Parrish, a "lighter-skinned male[,]" Mayfield, and Taylor. Hamilton testified that everyone in the group was arrested, and she attempted to obtain their statements. She noted that the two females' statements were "fairly consistent" about the circumstances surrounding the shooting and the identity of the shooter. Both females identified Pettway as the shooter.

When Hamilton spoke to Pettway with his attorney present, Pettway confirmed he was with the group at the restaurant and that he was in the rear seat behind Parrish, who was driving when they left the restaurant. Pettway reported that Parrish was the shooter. Hamilton confirmed the locations of the cars and bullets in the intersection and stated she did not believe it was possible for someone driving a car to shoot backwards and hit so many targets. She testified that the five .45 caliber shells found on the road were consistent with someone leaning outside of the vehicle

and shooting. In her review of the evidence she did not think it was likely that the driver was the shooter, and the evidence is consistent with the rear driver's side passenger being the shooter.

Hamilton noted that the inconsistent statements from Jesse's group of friends and family was "common" given the traumatic event. During cross-examination, Hamilton agreed that no one in Jesse's group observed a gun and that at least one witness believed the "light-skinned male" was the shooter. She reiterated that it would be "difficult" to drive and shoot a gun out of the window, but she did agree it was possible for someone to take their foot off the brake and shoot. She stated that while Parrish initially told her Pettway did not have a gun, he later said Pettway had a gun and that he was the shooter. She acknowledged the only people who reported Pettway having a gun were the other indicted passengers of the vehicle.

The jury charge included the following instruction regarding the sufficiency of testimony of the accomplices, Jones and Mayfield. The charge instructed the jury that it could not convict Pettway on the testimony of Jones or Mayfield unless the testimony is corroborated, and that evidence is sufficient to corroborate the testimony of an accomplice if that evidence tends to connect Pettway with the commission of the offense. The charge instructed that the testimony of another accomplice is not sufficient to corroborate the testimony of an accomplice, and that the corroborative evidence must be from some source other than accomplices. The

charge further instructed that proof that the defendant was present at the scene of the crime that was committed is not, in itself, sufficient to corroborate the testimony of an accomplice. The jury found Pettway guilty of murder and assessed his punishment at forty-six years of confinement.

**Analysis**

In his sole issue, Pettway challenges the sufficiency of the evidence to support his conviction for murder. Pettway argues that there was insufficient evidence to corroborate the accomplice witness testimony of Mayfield and Jones.

A defendant commits the offense of murder if he "intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). The indictment alleged that Pettway "intentionally and knowingly cause[d] the death of . . . Jesse [], . . . by shooting [him] with a deadly weapon, to-wit: a firearm[.]" In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in

favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010) (citing *Jackson,* 443 U.S. at 326); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The appellate court does not reweigh the evidence nor determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Article 38.14 of the Texas Code of Criminal Procedure provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice witness without other corroborating evidence tending to connect the defendant to the offense committed. Tex. Code Crim. Proc. Ann. art. 38.14. When conducting a sufficiency review of the non-accomplice evidence under article 38.14, we eliminate the accomplice testimony and examine the remaining portions to determine if there is any evidence that tends to connect the defendant to the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could

17

have found that it sufficiently tended to connect the accused to the offense." *Smith*, 332 S.W.3d at 442; *see also Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). No particular amount of corroborating evidence is required for sufficiency purposes. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

"'Tendency to connect' rather than rational sufficiency is the standard[;] the corroborating evidence need not be sufficient by itself to establish guilt." *Solomon*, 49 S.W.3d at 362. The corroborating evidence need not directly link the defendant to the commission of the crime. *Vafaiyan v. State*, 279 S.W.3d 374, 385 (Tex. App.—Fort Worth 2008, pet. ref'd). There simply needs to be other evidence tending to connect the defendant to the crime. *Id.* When there are conflicting views of the evidence, we defer to the factfinder's resolution of the evidence. *Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508.

The non-accomplice evidence that tends to connect Pettway with Jesse's murder includes:

- Testimony from Donald and Ethan that Jesse bumped or backed his chair into Pettway in the restaurant.

- Testimony from Jimmy and Ethan that Pettway told Jesse to "Watch yourself[,]" or "Watch out[.]"

- Testimony from Dennis, Jimmy, and Ethan that Pettway and Jesse exchanged words in the parking lot.

- Hamilton's statement that Pettway confirmed he was seated in the driver's side rear seat of the car.

18

- Statements from Dennis, Jimmy, Donald, and Ethan that Parrish was in the driver's seat of the car.

- Statement from Hamilton that it would be difficult to drive the car and shoot the gun out of the window.

- Statement from Hamilton that the bullet casings found on the scene indicate that the gun was fired outside of the window.

- Statement from Hamilton that the evidence was consistent with the rear driver's side passenger being the shooter.

- Statement from Hamilton that Pettway confirmed he was in the rear seat behind Parrish, who was the driver.

The jury also had the opportunity to view the video surveillance footage from the restaurant, as well as photographs and other evidence at trial, and to observe Pettway at trial.

We conclude that a rational juror could have found that the non-accomplice evidence sufficiently tends to connect Pettway to the murder. *See Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508; *Solomon*, 49 S.W.3d at 361-62; *see also generally* Tex. Code Crim. Proc. Ann. art. 38.14. We further conclude that the evidence is sufficient to support Pettway's conviction of murder. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 902, n.19; *Hooper*, 214 S.W.3d at 13. We overrule Pettway's sole issue. Having overruled Pettway's sole issue, we affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on March 4, 2024
Opinion Delivered July 31, 2024
Do Not Publish

Before Johnson, Wright and Chambers, JJ.